**WELLER MANUFACTURING COMPANY, etc.**

v.

**WEN PRODUCTS, INCORPORATED et al.**

No. 52 C 714.

United States District Court
N. D. Illinois, E. D.

April 1, 1955.

Supplemental Opinion April 13, 1955.

John Rex Allen, of counsel, Schroeder, Merriam, Hofgren & Brady, Chicago, Ill., Mason, Fenwick & Lawrence, Washington, D. C., for plaintiff.

Wallace & Cannon, Burke, Craven & Crane, Chicago, Ill., for defendants.

BARNES, Chief Judge.

The original complaint in this case was filed on April 1, 1952. A trial of the case was begun on October 15, 1953. It extended over a period of nine court days and was concluded on October 27, 1953. After the filing of briefs, the case was argued by counsel on December 21, 1953. On January 19, 1954, the court filed a memorandum decision, D.C., 121 F.Supp. 198, and made findings of fact and conclusions of law. On January 26, 1954, a final judgment, sustaining the validity of the patent and enjoining the infringement thereof, was rendered. On June 18, 1954, the defendants, having procured leave of the United States Court of Appeals for the Seventh Circuit to present a motion for a new trial, based on newly discovered evidence, presented such a motion in this court. On that date, the court fixed October 11, 1954, as the time for hearing the motion for a new trial based on newly discovered evidence and for a trial, and counsel were advised that the court would on that date hear everything desired to be presented on the motion for new trial and on a new trial, so that, in any event, one hearing would cover the matter. On November 18, 1954, the case came on for hearing on the motion based on newly discovered evidence and for trial. Opening statements on behalf of the defendants were heard and concluded, and the taking of evidence on the part of the defendants was begun. The hearing continued over a period of nine court days and was concluded on December 1, 1954. After the filing of briefs by counsel, final arguments were heard by the court on February 21, 1955, and the cause was taken by the court for decision.

On the motion for a new trial and trial the defendants relied upon evidence of the use, in the summer and fall of 1939, in the rewiring of the electrical engineering laboratory at Tri-State College at Angola, Indiana, of a soldering device consisting of a stepped down voltage transformer and a copper wire heating element connected across the secondary or low voltage side of the transformer. The burden of proof was, of course, on the defendants. There was some controversy between the parties concerning the degree of proof required. The court has not found it necessary to concern itself with that controversy.

At the conclusion of the taking of testimony on the motion and trial the court was of the distinct impression that the defendants had not sustained the burden of proof by any standard that might be applied. The reading of the briefs of counsel and the oral arguments of counsel confirmed the court in this impression. Since the oral arguments the court has read the transcript of the record and has abstracted the testimony of the key witnesses.

The witnesses, five in number, who testified for the defendants, that they used and/or saw used the soldering device consisting of a stepped down voltage transformer and a heating element connected across the secondary or low voltage side of the transformer, were Clyde Edgar Shaw, Millford Edward Collins, Thomas Boagey and Robert C. Arner, who testi-

fied in open court, and Samuel D. Summers, who testified by deposition.

The principal witness for the defendants was Clyde Edgar Shaw, who testified that he resided at Angola, Indiana; that he was by profession a teacher of electrical engineering in Tri-State College there; that he had been a student at Tri-State College; that he was graduated with a bachelor's degree in electrical engineering in 1936, that he received a master's degree in electrical engineering from Texas Agricultural & Mechanical College in 1942, and that he had held a certificate from the University of Minnesota; that he had been a distributor of the products of the defendant, Wen Products, Incorporated, for a number of years; that among the articles which he distributed was the alleged infringing soldering gun, manufactured by Wen Products, Incorporated; that he wrote Mr. Anton, the president of the defendant Wen Products, Incorporated, in response to a bulletin which Mr. Anton sent out concerning this case. In his letter to Mr. Anton, Mr. Shaw told of a use in 1938 of a device which he thought would anticipate the patent involved in this suit. That letter initiated the present proceeding.

While Mr. Shaw has been characterized as a "completely disinterested witness," the record shows that he has been a distributor for the defendant, Wen Products, Incorporated, for some years (R. 1858). His testimony and activities in this case indicate a desire to assist the defendants. Furthermore, he repeatedly adjusted his testimony to suit what to him seemed to be the momentary exigencies of the case.

There runs through the testimony and deposition of Shaw the indication that he is a witness with a poor memory generally, and an extremely poor recollection of dates. In his first letter to the defendant, Wen Products, Incorporated, he stated that the alleged prior use occurred in the year 1938 (R. 1861), while his later testimony consistently attempted to place this use in the year 1939. In his discovery deposition he placed the date of his return to Tri-State College from Texas A. & M. as the fall of 1943 (R. 2586) while in his testimony on the stand he stated that he returned to Tri-State College in 1942 (R. 1865-6). He could not recall for how long he had been a distributor for the defendant, Wen Products, Incorporated, although he admitted that he had been a distributor for the defendant for some years (R. 1858).

His memory was particularly weak with respect to the approximate dates of the events occurring in 1954 in connection with early visits by counsel for defendants and attempts to locate transformers used in the 1939 soldering device. He first testified that he initialed the 5 to 1 ratio transformer, defendants' Exhibit D-9, at the time of Mr. Cannon's first visit to Angola, which was on March 27, 1954 (R. 1749), but later stated that he initialed the transformer at the time he executed his affidavit on April 21, 1954 (R. 1894-5). He first testified that the 40 to 1 ratio transformer, defendants' Exhibit NT-21, was discovered and initialed by him approximately one week after the 5 to 1 transformer, defendants' Exhibit D-9 was initialed, and that this occurred in May, June or July of 1954. He later admitted that the 40 to 1 transformer was never demonstrated to defendants' counsel until after his deposition was taken on July 12, 1954 (R. 2037), although he had earlier insisted that this transformer had already been removed from the storage room and was not available for inspection by plaintiff's counsel during their visit to Angola on June 24th (R. 1764-6). He later stated that the 40 to 1 transformer was first given to defendants' counsel in August or September of 1954 (R. 2030). (The defendants requested specification information from the General Electric Company regarding the 5 to 1 ratio transformer in May, 1954 (Defendants' Exhibit NT-17-A), and specification information regarding the 40 to 1 transformer was not requested until October 4, 1954 (Defendants' Exhibit NT-19-A). Mr. Shaw could not remember the dates or

number of visits of defendants' counsel to Angola occurring since March, 1954 (R. 2537–9).

The testimony of Mr. Shaw regarding the precise structure of the Angola soldering device and the particular transformer used with it varied so greatly that it is impossible to say with complete certainty just what that construction was. In Mr. Shaw's deposition, taken July 12, 1954, he stated that although he had no definite recollection as to the length of the copper tips employed with this device (R. 2588) his best recollection was that they were approximately 14 inches in length and did not exceed 20 inches (R. 2587–8), but conceded that in some cases they may have been as short as 6 inches (R. 2588). This obviously had reference to the total length of the wire from terminal to terminal, in view of the context of this deposition testimony. However, in his testimony at the hearing, he stated that the first copper tips projected as much as 18 to 20 inches from the transformer, producing a total tip length of 36 to 40 inches, and that they finally changed to short tips, projecting not more than an inch, an inch and a half, or two inches beyond the edge of the transformer (R. 1687). (Mr. Summers unqualifiedly testified that the tip length from terminal to terminal was on the average from 6 to 8 inches, although the longest length of wire used may have been as much as 10 inches in experiments (R. 2474–5).)

While Mr. Shaw testified in his deposition that nichrome was not used as a tip material in the device (R. 2559), he testified at some length at the hearing regarding the initial use of nichrome ribbon (R. 1688, 1930).

His various statements concerning the transformers used are irreconcilable. He first stated at the hearing that four different transformer ratios, namely, 5 to 1, 15 to 1, 25 to 1 and 40 to 1, were actually used in the alleged soldering device (R. 1611). However, in colloquy with the court following his identification of the transformers, Defendants' Exhibits D–9 and NT–21, he insisted that the 5 to 1 ratio transformer and the 40 to 1 ratio transformer were all that he ever used (R. 1772). He first testified that a 5 to 1 ratio transformer was used at the beginning of the rewiring project at Tri-State College but that this transformer burned up (R. 1754, 1769). He testified that approximately 20 lugs were soldered with this transformer (R. 1770). This transformer, he testified, was followed by another 5 to 1 transformer, which he stated was the transformer in evidence ad Defendants' Exhibit D–9 (R. 1755). He testified, first, that approximately 20 lugs were soldered with this transformer, Defendants' Exhibit D–9 (R. 1755, 1771) and later that approximately four boxes of lugs were soldered with this transformer (R. 1771), although he had earlier estimated that there were approximately 30 terminal lugs to be soldered in each junction box (R. 1618). He then produced the 40 to 1 ratio transformer, Defendants' Exhibit NT–21 and testified that substantially all of the rest of the job, following abandonment of the transformer, Defendants' Exhibit D–9, was completed with the 40 to 1 transformer (R. 1759–61, 1771), and that this amounted to approximately 200 lugs (R. 1950). He later, however, referred to a 15 to 1 ratio transformer, which he stated "works better than either of these two, counselor" and "this 40 to 1 here, counselor, doesn't give as good a demonstration as the 15 to 1". (R. 1885). This becomes utterly confusing when he testified later that only 20 lugs were soldered with this 15 to 1 transformer (R. 1946), that they used the 15 to 1 briefly and it then dawned on them that they were on the right track and they then went to the 40 to 1, which does an excellent job (R. 1886), that the larger transformer that they went to between the 5 to 1 and the 40 to 1 was a little slow (R. 1755) and that, in reply to an inquiry as to why he didn't complete the job with the 15 to 1 if it was superior (R. 1944): "It's really a matter of indifference, sir. This discussion about transformers is rather trivial. Any of them will work, and will work very well.

I went down in the lab one day and some of the boys had set up a 40 to 1, and we just continued using it. That is all. It was so slight a difference it didn't make any difference."

At a later stage in his testimony, after reviewing at separate points the proportion of the rewiring job done with the American Beauty soldering iron, the carbon brush device, and the various forms of the copper tip device employing different transformers, he suddenly began alluding to uses of the 5 to 1 ratio transformer (R. 1898–9), the 15 to 1 transformer (R. 1945), and the carbon brush device (R. 1951) only in removing old lugs from the old cables withdrawn from the floor conduits, in the apparent realization that his prior estimates of the extent of use of each form of device was completely irreconcilable with the total number of lugs involved in the rewiring project. In this connection, he once alleged that the 5 to 1 ratio transformer was used primarily to remove lugs from the old cables (R. 1898–9) and then later testified that possibly all of this unsoldering was done with the 15 to 1 ratio transformer (R. 1945).

The 5 to 1 ratio transformer, Defendants' Exhibit D–9, was the one illustrated in the photograph, Defendants' Exhibit B, attached to the affidavits of each of the fact witnesses originally presented to the Court of Appeals and to this court. It is interesting to note that Defendants' Exhibit B was therein represented to be "A photograph which correctly illustrates the construction of said transformer which was embodied in said soldering device," while the transformer shown in the photograph Defendants' Exhibit B is represented to be the actual transformer embodied in the prior use soldering device in the affidavit of defendant's attorney, Mr. Cannon. Reference is made to the following excerpt from page 2 of Mr. Cannon's affidavit:

"And in the course of said investigation the said Clyde E. Shaw found the original transformer which *was embodied in said soldering device*

*and which is illustrated in the photograph* 'Defendants' Exhibit B.'"

However, when Mr. Shaw was questioned at the hearing about this representation, he insisted that the 5 to 1 ratio transformer illustrated in the exhibits attached to the affidavits were *"merely illustrative"* of the type of transformer employed in the prior use soldering device. (R. 1893–4, 1896, 1958).

Mr. Shaw's representations in this regard are in complete conflict with the testimony of defendants' witness Summers, who testified in his deposition: (R. 2433–4)

"Q. But whether it was one transformer or 6 transformers that you used, you say the rating was the same as is shown on that particular one?

"A. Yes, we had two or three ratings, but we had at least 6 transformers of this same rating, 25 amperes on the high current side, 5 amperes on the low current side.

"Q. And you are certain that the rating that was used was one of those transformers of that particular rating as shown on this nameplate?

"A. That I can be sure of, yes."

A conflict should also be noted in connection with Mr. Shaw's identification of the 5 to 1 ratio transformer (Defendants' Exhibit D–9). Although his identification of the transformer was quite positive, it is to be noted that when he was initially confronted with this transformer he stated "As to whether this is an exact model, as to whether it is one of them, I don't know, unless I would find my initials on it and my signature." (R. 1747). He later insisted, however, when questioned by the court and when questioned on cross-examination, that he did not have to rely on his initials to identify the transformer (R. 1753, 1870).

Also, he attempted to support his identification of this transformer by observance of the transformer insulation having been overheated and by observing abrasions on the top of the transformer.

where the parts of the soldering device were allegedly mounted (R. 1749), although he stated in his deposition that there were no identification marks on the transformer which led him to his identification (R. 2545).

The identification of the 40 to 1 transformer, Defendants' Exhibit NT–21 is also extremely suspect in view of the fact that Mr. Shaw was given full opportunity at the deposition, through questions concerning the ratios of transformers other than the 5 to 1 ratio transformers to mention this transformer ratio or any others which he recalled and he never suggested that he recalled any other specific ratio (R. 2543–5).

A peculiar conflict arises in connection with reference to attempts to locate parts of the original device. While defendants' counsel stated, at page 2 of his affidavit as originally filed in connection with this proceeding, that he had numerous phone calls with Mr. Shaw between March 9th and March 27th relative to Mr. Shaw's investigation of the matter and that Mr. Shaw advised him "shortly prior to March 27, 1954, that after diligently searching therefor, he had been unable to find the said soldering device itself, or any drawings or sketches of the device" and "that during our visit in Angola, Indiana, the said Clyde E. Shaw and said Nicholas T. Anton and I continued our investigation of this matter, including searching for the original transformer and other materials used in making the aforesaid quick-heating soldering device", Mr. Shaw insisted that he had never reported to Mr. Cannon that he was unable to find any parts of the device (R. 1877), that he had never been requested to try and locate these things (R. 1879) and that he had picked out the 5 to 1 transformer and brought it up to the laboratory prior to Mr. Cannon's visit to Angola to have it available in case they visited him (R. 1880).

The witness was hazy as to the type of voltage supply that would be suitable for the alleged Angola soldering device. At R. 1902–3, he stated that either transformer would work satisfactorily when directly connected to a 110-volt supply. On several other occasions he had insisted that a 110-volt input was too much voltage for this device (R. 1698, 1855, 1907–9). The affidavits of each of the parties clearly suggest, however, that the device did operate satisfactorily off of 110 volts and both Mr. Summers and Mr. Shaw so testified in their depositions (R. 2415–17, 2446–7, 2602). It is clear, however, from the demonstrations conducted in open court by the plaintiff, that under no circumstances could this alleged soldering device have been satisfactorily operated with either the 5 to 1 ratio transformer or the 40 to 1 ratio transformer and the copper heating tip, if the transformer input terminals were connected directly to a power source rated at 110 volts (R. 2797–2815).

Mr. Shaw was obviously not convinced in his own mind as to whether the rheostat was essential to the device. On two occasions he testified that the purpose of the rheostat was to serve merely as a convenience for supporting the soldering device (R. 1700, 2573), although on other occasions he recognized that the rheostat was necessary or desirable to reduce the voltage to the input terminals of the transformer (R. 1719–21, 1853–4, 1807).

His recollection was inconsistent as to the type of leads that were employed to supply current to the transformer of the soldering device. He usually testified that two 250-foot No. 10 or No. 12 copper wire leads were employed between the source of power and the transformer terminals (R. 1702), although in his deposition he had recalled only a four or five foot old iron cord (R. 2570) and when asked what else he used he only recalled an old soldering iron cord which may have been used in addition (R. 2601, 1992–3). He admitted that he never at that time suggested that he used the 250-foot cord (R. 1992–3).

Considerable testimony was given by Mr. Shaw at the hearing concerning the use of a certain transformer bank from which voltages representing substantial reductions from the 110-volt input were available and used to supply the soldering

device (R. 1607, 1694). In his deposition, although he was questioned at length concerning the voltage supplied to the soldering device, he did not suggest the use of any voltage reducing instrumentality other than the rheostat (R. 2050, 2063–4).

In his testimony at the hearing Mr. Shaw was quite positive as to his recollection of the vacation period between the summer and fall terms in 1939 as being the time when this laboratory rewiring project was undertaken and completed (R. 1649–50), but, in his deposition, he was indefinite as to whether the work was done in that vacation period or in the earlier vacation period between the spring and summer terms in that year (R. 2566–7). Although he states that his later recollection is based on his class record book (Defendants' Exhibit NT–35), and the college calendar for the year 1939 (Defendants' Exhibit NT–36, 36–A) neither of these documents, so far as the court can discover, assists in indicating which of the vacation periods, if either, covered the period of the rewiring project.

Another inconsistency in this case occurs in connection with Mr. Shaw's insistence that substantially the entire soldering work involved in this rewiring project was done by him and Mr. Summers during the fall vacation period. This is hardly reconcilable with the testimony of the witness Boagey, who stated that he assisted Mr. Shaw and Mr. Summers in the use of the soldering device in connection with the rewiring job prior to the vacation period between the summer and fall terms (R. 2123) and with that of defendants' witness Arner, who testified that he witnessed the work being done in August, 1939, prior to the end of the summer term (R. 2182). Plaintiff's witness, Elegante, testified that he personally performed over 80% of the soldering work and that this was done during the first two weeks following the beginning of the fall term (R. 2248, 2268, 2274).

Other conflicts of some interest are Shaw's testimony at the hearing that he personally did the menial work in connection with the construction of the carbon brush device allegedly conceived by Summers (R. 1692, 1997, 1999, 2008), whereas, on at least one earlier occasion, he had testified that Mr. Summers made up the device using the carbon brushes as the heating element (R. 1690), and his testimony in his deposition was that Mr. Summers made up the carbon brush device (R. 2555, 2557). Mr. Summers and Mr. Shaw each claimed that they originated the copper tip soldering device (R. 2448, 2591).

Milford Edward Collins testified (R. 2066 et seq.) that he resides in Dallas, Texas, that he is an engineer by profession, that he was presently director of engineering for the Bureau of Aeronautics representative's office in Dallas; that he had been associated with Tri-State College at Angola, Indiana, from 1922 to 1925 as a student and as a student instructor in the laboratory, and from 1926 to 1942 as a professor of engineering. He further testified that he saw two soldering devices used in connection with that rewiring of the laboratory in 1939. That one was two insulators, with a spring device on one end, two carbon brushes that were connected through an electrical circuit, and they would clamp the lug in between there, the lug becoming a part of the circuit, thereby heating the lug to a temperature sufficient to perform the soldering operation; that the other device that they used was one using a current transformer in reverse and putting a copper wire across the terminals in a U or V shape, and thereby producing sufficient heat and bringing the lug in contact with this secondary circuit which was heated, that Clyde Shaw demonstrated that to him, and that Shaw made a soldering connection with the device in his presence.

On cross-examination, Mr. Collins further testified (R. 2081) that Pat Coon brought the affidavit which he executed to him and asked him if he would read it and make sure it was a true statement of facts, and if it was if he would sign it; that this was a prepared affidavit

that came to him, that he made changes in the affidavit which are indicated by the ink notations which appear in the affidavit, and that, outside of those changes, the affidavit was as received by him from Mr. Coon; that the sketch marked Defendants' Exhibit A was attached to the affidavit when it was submitted to him; that he also signed Exhibits marked B, C, and C-1, attached to the affidavit, and that the sketch marked Defendants' Exhibit A, refreshed his memory.

Mr. Collins testified further, on cross-examination (R. 2083) that the carbon brush type soldering device was demonstrated to him by Mr. Shaw, but not in connection with the wiring of the laboratory, and that he did not see anybody using the copper tip transformer type soldering device beside Mr. Shaw.

Thomas Boagey testified that he lived in Biloxi, Mississippi, that he is by profession an electrical engineer, employed by the United States Air Force, that he received a degree in electrical engineering from Tri-State College in 1931, that he had been employed as a student instructor at Tri-State College in the electrical laboratory, that he taught there, including his laboratory teaching, as well as class room teaching, from 1930 to 1942. The witness saw Mr. Samuel D. Summers and Mr. Clyde D. Shaw rewiring the laboratory, they were using a soldering device consisting of a current transformer, of which there were quite a number in the electrical laboratory, used to operate in inverse from the original design with a copper wire in hairpin shape attached to the secondary terminals. Witness saw Mr. Shaw and Mr. Summers perform soldering operations with that transformer copper tip soldering device. Witness not only saw them, he assisted and used the device himself in the year 1939, in the summer and in the summer vacation. Witness saw 15 or 20 operations in this one floor box that he participated in. Witness does not know what the ratios were of that current transformer. During the soldering connections that witness participated in making use of this transformer copper tip soldering device, the device was connected to the commercial power as furnished by Indiana Public Service Company to that building, as a source of electric power. On cross-examination, Mr. Boagey further testified (R. 2127) that, in connection with the rewiring of the electrical machinery laboratory in 1939 he saw a soldering device using a transformer and carbon brushes, that he never saw it connected up or used, but that he did see a pair of tongs that were similar to a pair of scissors with carbon blocks on the end of it laying around the building. Mr. Boagey further testified on cross-examination that defendants' counsel first contacted him in April, 1954, by telephone, that he recalled the conversation, that the substance of it was:

"Mr. Boagey, do you remember using a device for soldering that utilized a transformer at Tri-State College? And I said, Yes, sir. I do. Then he asked me to give a description of this, how it was done. I mentioned it was a shorted secondary on a transformer in which I heated some copper terminals and soldering them on a wire.

Mr. Boagey further testified on cross-examination:

"Q. In your discovery deposition you were asked: 'Q. What was the substance of the conversation that/you had with him?' meaning counsel for defendants. You said: 'He asked me over the telephone whether I had any recollection of a transformer. You must remember I am going back to April of this year and can't repeat exactly verbatim. I may have said current transformer or ordinary, but he asked whether I had any recollection of it being used in Tri-State College for soldering purposes, and I said I did'. Q. Did he ask you to describe the structure? No, sir, I don't think he did. Wait a minute, let me think. He may have asked me whether a secondary of a transformer was ever used for heating copper wire to solder with, and I said yes, I had, and I helped with it. Q. So far as you know, you

didn't give a description of the device at that time? A. No, sir, I wouldn't say I gave a complete description of it. I said it was a current transformer."

"Is that substantially correct? A. I would say so."

Mr. Boagey further testified on cross examination (R. 2132) that he executed an affidavit in this case the latter part of April or the first part of May (1954), that he was called to the office of an attorney in Gulfport and handed an affidavit, that he signed and swore to the affidavit after making only two corrections in it—striking out an initial in witness' name and filling in the year 1941.

Mr. Boagey further testified, on cross examination, that there was a sketch and other exhibits attached to the affidavit when it was submitted to him, that the sketch which is attached to the affidavit marked Defendants' Exhibit A refreshed witness' recollection, that, referring to page 11 of witness' discovery deposition as follows:

"Q. Do you recall whether there was a sketch attached to that affidavit? A. There was.

"Q. Do you know who prepared that sketch? A. I can remember the name on it, Clyde E. Shaw.

"Q. Did that sketch refresh your recollection on it? A. Very definitely. For one thing, all the terminal boards, we had a very unusual terminal. It was a very large brass terminal which we couldn't buy commercially. That was for students to rapidly unloose and tighten it. These large brass terminals were made at the school. In this transformer assembly, they were used in the transformer assembly for attaching copper wire between the secondary terminals as used. I mean, as the transformer was used. That is why I can particularly recognize that one transformer on the sketch.

"Q. And this sketch brought back to your recollection the structure which was used at that time? A. Right, sir."

that is a correct statement.

Mr. Boagey further testified (R. 2145) that he never saw this wire tip soldering device which he used in soldering directly connected to a commercial outlet without a voltage-reducing device between the outlet and the transformer of the soldering tool, that there was a voltage dropping device,—a rheostat or rheostats —connected in series with the primary of the transformer as it was connected.

Robert C. Arner testified that he resided in Blue Island, Illinois, that he was an electrical engineer employed by the Buda Company in Harvey, that he had been with that company six years, that he had received a bachelor of science degree in electrical and radio engineering from Tri-State College, where he had attended from March, 1938, through August, 1940, that he was in attendance at the college in the summer of 1939, that during his attendance at the college he took a course taught by Professor Collins and laboratory work under Professor Shaw, that he saw rewiring done in the electrical machinery laboratory in August, 1939, that there was a soldering device used by Professors Shaw and Summers in connection with wiring up the electric motors. Mr. Arner further testified (R. 2182) that the secondary portion of the soldering device, which had the heavy leads coming out, was about 10 inches overall in length, stood up about 5 or 6 inches high, with an overall width of about 5 inches, and there was a strip of wood laid on top of the secondary leads, there was a black cable that connected from the outpoint of these leads that came to a little terminal on this block of wood toward the center, and from that center portion was a copper wire bent like a U shape and 10 or 12 inches long, that the transformer was about 3 inches from the center line out to the edge of the transformer, and this portion, the copper wire itself, extended about 4 to 6 inches beyond that point. Mr. Arner further testified that he saw

a soldering connection made with this soldering device, Professor Shaw did the work and Professor Summers was there at the time the work was done; that they held the terminal on the inside of the shape, turned the current on with solder in this terminal, and immediately the thing was heated up to a point where they could put the wire or cable into it, that required a very short time to do it. Witness saw six or more soldering connections made with the soldering device with the transformer and copper tip. Mr. Arner further testified on cross-examination concerning conversations with counsel for the defendants as follows (R. 2207): that counsel said he had been over to see Professor Shaw and Professor Shaw had located this transformer for him, and told him about the use of the device for soldering, that when counsel came out to see him he did not bring the affidavit with him, that he brought that at a subsequent time, and witness signed it at a subsequent time, that counsel showed witness the sketch, Exhibit A, attached to witness' affidavit at the first visit, and that witness does not remember whether or not counsel showed him the photograph of the transformer at the first visit.

Samuel Dewey Summers testified (R. 2352) that he resided in Washington, D. C., that he is, by profession, an electrical engineer, that he is and since October 1, 1945, has been, employed as an electrical engineer by the Navy Reserve Laboratory in Washington, that prior to that time the witness was an electronics officer in the Naval Reserve, and prior to that he was a teacher of electrical engineering at Tri-State College at Angola, Indiana, for about $11\frac{1}{2}$ years, that he taught electrical engineering, mathamatics and physics, that witness graduated with the degree of bachelor of science in electrical engineering from Tri-State College, that he took his master's degree at the University of Maryland and attended the University of Michigan graduate school, the Massachusetts Institute of Technology, and West Tennessee Teachers College.

About 42 pages of the record are devoted to a description of the buildings on the campus at Tri-State College, of the engineering building, of the engineering laboratory, of the machinery in the engineering laboratory, and in identifying photographs of parts of and machinery in the engineering laboratory. The witness further testified (R. 2397) that those lugs that were used by the witness in rewiring the electrical machinery laboratory at Tri-State College in the summer of 1939 were fastened to the cables by means of solder, that the work of rewiring was done principally by witness and Clyde Shaw. The soldering device used by witness in the electrical machinery laboratory in the summer of 1939 consisted of a step-down voltage transformer and a heating element across the secondary or low voltage side of the transformer. Witness built the device. This device was used because it would produce heat rapidly at any time it was needed.

"Mr. Cannon: I show you what purports to be a photographic copy of a drawing (document was marked Defendants' Exhibit D–6 for identification). I will ask you to examine that photographic copy and tell us whether or not that illustrates the soldering device that you used in the rewiring of the electrical machinery laboratory at Tri-State College in the summer of 1939. A. Yes.

"Mr. Fenwick: The question is objected to as grossly leading, as an attempt to refresh the recollection of the witness as to what took place in 1939. He has not been requested to testify of his own recollection or any records that he may have as to what the device was at that time.

"The Court: Sustained. * * * I don't know why in the world you showed the witness that sketch. * * * I am ruling that the testimony of this witness with respect to that drawing is incompetent and improper. His recollection should not have been refreshed that way. It destroys the value of the witness. That will be the ruling right along.

"The Witness: This sketch represents a transformer device, and across the low-voltage terminal points was a conductor used as a heating element." Witness can point out the parts in the sketch as he refers to them, so that they will be identified on the record. "The loop nose, identified in the sketch as copper heating or soldering tip, is the heating element. The lower and main part of the figure represents the current transformer. By the secondary terminals of the transformer and the heating element there is an intermediate connection of larger cross-section than the heating element for the purpose of using a short heating element. The terminals of the heating element are mounted on a board of wood for the purpose of rigidity. The input elements referred to as the high voltage winding or primary are on the right-hand foreground of the transformer, and the arrows pointing to the various parts of the transformer do not clearly identify these terminals." The witness marked the input terminals or high voltage winding terminals. The transformer was designed and originally used by the local power company as a current transformer. "However, a transformer is the same wherever you find it and is used simultaneously as a voltage transformer and as a current transformer. When one says that a transformer is a current transformer it means that it is used to meter the current in a high voltage circuit, a circuit in which the voltage would be in the order of several thousand volts. It is used, therefore, for two purposes: to isolate the meter from the high voltage winding, and generally to step down the current from a high value to a value which may be passed through an electrical meter. That current transformer was used in this soldering device because it was available and of suitable capacity and range. In the transformer which was used, the high voltage winding was designed to carry 5 amperes continuously. The low voltage winding, which means high current winding, was designed to carry 25 amperes continuously with a high factor of safe-

ty. For short periods of time it could carry from 100 to 200 amperes without becoming excessively hot. The relative cross sections of the copper in the low voltage winding and the high voltage winding would be in the ratio of 10 to 1. The output winding would be 10 times larger than the input winding. The heating tips, either tried or used, ranged in size from No. 10 to No. 12 copper. They were smaller than the low voltage winding. The high voltage side of the device was operated off from 115 volts alternating current source. Such a source of current was available in the laboratory at that time. In some cases the input side of the transformer was connected directly to the commercial current source there in the laboratory. At other times a rheostat in series with the high voltage winding was used to limit the flow of current to a value which was satisfactory for the heating element. An ordinary heavy-duty laboratory rheostat was used.

"Mr. Cannon: Q. I show you those two photographs, Defendants' Exhibit D–7a and D–7b for identification, and ask you to look at the objects thereon and tell us whether or not you can identify them. A. Yes, these are laboratory rheostats that are used in the laboratory at Tri-State College and were available in the summer of 1939.

"Mr. Fenwick: The question and answer are objected to as leading the witness. The Court: Sustained.

"The Witness: Yes, this is a typical rheostat. It is one of several that were available in the laboratory. The rheostat was used with the soldering device to limit the current to a satisfactory value because the current transformer used was not quite the correct ratio of transformation. (The two photographs were offered in evidence and objection sustained to them).

"The Witness: The soldering device was directly connected with the 115 volt line on several occasions. It worked satisfactorily when it was connected directly across the 115 volt line. It took less than a minute—in the order of half a

minute—a quarter to a half a minute, dependent upon the heating element and whether or not a rheostat was used in the input circuit to heat up the soldering device. It heated up slower when a rheostat was used than when it was connected directly across the 115 volt line. Several heating elements were used, including copper and iron. Both produce heat in sufficient quantities. However, because of the more readily tinnable nature of copper and its lesser tendency to oxidize at the operating temperature, it was found more suitable than iron. At times there was used a copper heating tip in the soldering device connected directly across the 115 volt line. It would be very satisfactory. Soldering connections were made with it. The soldering device would be located close beside the junction box and it would be maybe even lowered down so that portions of it were down inside the junction box, that is, the soldering device, including the transformer, was lowered to a position inside the junction box. The lugs were placed in the loop of the heating element in a vertifical position with the open end of the lug upward. When sufficient heat had been produced in the lug, solder flowed into the hole. The wire terminal was set in the hole of the lug and the soldering connection completed. Electrical transformers were available commercially on the market in the United States in the summer of 1939 which could have been used directly across the 110 volt line in this soldering device without the necessity for turning it off and on quickly." This object which you handed to witness is a knurled nut, which was constructed at Tri-State College and used for many purposes around the electrical laboratory. It was used in attaching the heating element to the transformer. The witness pointed out on Defendants' Exhibit D–6 where the connectors, such as Exhibit D–8, were used in that soldering device. The witness is shown an object marked Exhibit D–9. He said it was a current transformer typical of the units used at Tri-State College during the summer of 1939. It exemplifies the type of transformer used in the soldering device. The witness cannot tell if it is the identical transformer with the same rating and same appearance. In fact, more than one transformer was used for the same purpose at different times, and whether or not this is the identical one the witness cannot say. Mr. Clyde E. Shaw and witness and others who had occasion to do any work around the laboratory used the soldering device. James Elegante, Thomas Boagey, and perhaps Milford Collins used it. This soldering device was used from time to time until witness left the college in 1943. It was kept in the electrical machinery laboratory. The soldering device was seen by other persons than witness and Clyde Shaw and those who used it. The laboratory was open to the student body and the public. The soldering device which was used was a practicable operable soldering device which was practical for our purpose and for any other purpose in which heat was desired. It was primarily an electrical heating apparatus. It included a voltage stepped-down transformer. It included a primary and secondary winding. It included a detachable heating tip. The heating tip was connected rigidly across the secondary of the transformer.

Cross-Examination by Mr. Fenwick. (R. 2431) The photographs which witness identified here today, other than those out of the Modulus year book, he first saw on Thursday of this week in a conference with Mr. Cannon. He showed witness the transformer at that time. Witness examined it at that time. Witness cannot say that this is the identical transformer. However, it is the same style and rating as those used. More than one were used. This transformer has the identical rating that was used back then. There were transformers of two or three ratings. There were at least six transformers of this same rating. 25 amperes on the high current side, 5 amperes on the low current side. Witness is certain that the rating that was used was one of these transformers of that particular rating as shown on

this name plate, that, witness can be sure of. The knurled nut that witness identified today was shown him by Mr. Cannon on last Thursday. Mr. Cannon first contacted witness in connection with this case. Witness believes it was by local telephone. Mr. Cannon had written witness to arrange a meeting day for this occasion. It was one letter. Mr. Clyde E. Shaw never contacted witness relative to this matter. Witness contacted him after first being contacted by Mr. Cannon. Mr. Cannon arranged to come out and see witness one evening and ask some questions about what witness had done, then witness wrote Mr. Shaw and said that witness had been contacted by Mr. Cannon in regard to this heating device. Mr. Shaw wrote back and said that he also had been contacted by Mr. Cannon. Witness cannot produce the correspondence. It has been destroyed. Mr. Shaw has never telephoned witness. Witness has executed an affidavit in connection with this use in Angola. The affidavit was prepared out of witness' presence and sent to witness by Mr. Dent and Mr. Cannon for execution. Witness received it from Mr. Dent. Witness made no change in it. It was correct and witness executed it as it was prepared. Mr. Cannon informed witness that Mr. Shaw had also executed an affidavit. Mr. Cannon showed witness a copy of Mr. Shaw's affidavit. Witness examined the affidavit of Mr. Shaw to see that it agreed with one that witness signed, that was at the same time, that is, on the same occasion that witness executed his affidavit. Witness was not shown any sketch of the soldering device alleged to have been used in Angola in 1939 prior to the execution of witness' affidavit. Witness never saw the sketch marked Defendants' Exhibit D–6 before he executed his affidavit, witness never saw the sketch, it was prepared afterwards, witness thinks. It was prepared after witness had executed his affidavit. Witness does not believe it is a part of his affidavit. The sketch was not a part of witness' affidavit as witness recalls it.

"Mr. Cannon: I would suggest to counsel that counsel let the witness see the affidavit that he has been asking him about, or a copy of it.

"Mr. Fenwick: I am asking the witness for his recollection.

"Mr. Cannon: You have asked him about an affidavit, Mr. Fenwick. If you don't show him the affidavit, I will.

"Mr. Fenwick: If you want to continue to lead the witness it is all right with me. (Apparently, the witness was shown his affidavit and then said:) 'But, since the sketch was not a part of my affidavit, and my affidavit represents what I did, I don't believe I saw the sketch before I signed my affidavit.' "

Witness has had four meetings prior to date with Mr. Cannon. Witness has had one meeting with Mr. O'Keefe on Thursday of this week. Witness had a meeting with Mr. Dent. This soldering device which witness used in 1939 was discussed at all those meetings. Witness left Tri-State College in February, 1943; between the time witness left Tri-State College in 1943 and when he was first contacted with reference to this case he never discussed this soldering device with anyone. Witness first assembled and constructed the soldering device with Mr. Shaw's assistance in constructing it, in the summer of 1939. The transformer weighed about 15 or 20 pounds. The transformer's dimensions overall would be in the neighborhood of 11 or 12 inches from terminal to terminal. Witness did not nor did any other person to witness' knowledge make any record of the serial number or other identifying information in regard to the transformer. Witness cannot produce any records describing the soldering device used by witness in 1939 or any of those materials or component parts. Witness' testimony in connection with this alleged use is purely recollection after a lapse of some 15 years. The length of the wire used as a tip, on the average, would be from 6 to 8 inches. That was a total length extending from the terminals. The longest length of wire used, with a

copper tip, was maybe 10 inches. The one usually used was 6 to 8 inches. The approximate gauge or diameter of the tip used was No. 12 or No. 10 copper wire. The approximate input voltage when this 6 or 8 inch copper tip was used was in the order of 115 volts, sometimes less than that, when it was found desirable to use a rheostat in series with the transformer primary. Witness recalls talking to Mr. VanPoole over the telephone on two occasions. Witness imagines he told him that the soldering device was hooked up directly to the source of power. That is the way it was used occasionally. It might overheat if left on too long. When iron or Nichrome was used, the length of the tip was 6, 8 or possibly 10 inches. Too long a length would be too flexible and too easily bent. This tip was electrically connected to the transformer by means of connecting bolts. A fillister head screw and a knurled nut were used. The tip was physically supported on the transformer by a wooden board. Mr. Shaw and witness actually did the work of placing the mounting strip or piece of wood or board on the transformer. Witness and Mr. Shaw were working together and decided it would be a quick way of doing it. The mounting board itself was attached in this way, connecting from the terminals of the transformer to the terminals of the heating element was a piece of stiff copper cable with sufficient rigidity so that when it was attached to the board the stiffness of the copper cable of the large cross section was sufficient to hold the wooden board in position; in other words, no extra screws. The board just rested on top of the transformer with no other securing means than this cable. There might have been some adhesive tape on there to begin with but by the time the work was finished it wasn't there probably and it was not really necessary. The cross section of these conductors from the output winding terminals was No. 2 copper cable or No. 1. Their length was 4 or 5 inches, each one. The transformer had a base of some sort.

The transformer had a mounted base. On occasions the device was held down inside, or partially inside, the junction box. It would be partially supported by resting on the side of the junction box. It was a little too heavy to hold out in one hand. The device would get quite hot if it was used for a while. We did not, as far as witness could determine, damage the insulation on the transformer by any of our operations though. It was not used continuously. We would solder maybe a dozen or 15 lugs at one operation and then we would stop and do something else and it would have time to cool. Conceivably, it would overheat if we were to turn it on and leave it heating continuously, like any electrical device. There was no board on the bottom of the device. It never got so hot that it was necessary to have a board. It never got so hot but that one could hold it in his hand for that matter. The internal construction of the transformer was not altered in any way. The turns ratio of the transformer used was 5 to 1. Witness cannot say what the ratio of the voltage was during the operation as to the soldering device, but certainly it was greater than 5 to 1. The current ratings of the device indicated by the exhibit is 25 amperes on the primary and 5 amperes on the secondary. The transformer was designed to be used conventionally as a current transformer. The use of this transformer in the soldering device was not in accordance with this conventional use of this transformer. It was reversed. No measurements or other tests were ever made to determine precisely what these input voltages or currents were, except to determine that the transformer was not overheated. The voltage across the wire tip of this soldering device while current was flowing in the circuit would depend on the heating element and whether or not there was a resistor in series with the primary or not. The voltage in general was in the order of one or two volts or less. The approximate current flowing in the output circuit of the soldering device was limited to the order of 100 amperes

or so. No measurements or tests of the voltages existing in the output circuit of this device were ever made during its operation. Witness is simply estimating. We first used a rheostat with this device when we first assembled it. A rheostat continued to be used on occasions, depending on the type of work being done. It was not necessary to use the rheostat to limit the current in the heating element to a value which was commensurate with the work in hand. If the rheostat had not been used the device would have produced more heating in the heating element than was needed. In other words, it would get too hot too quickly and overheat the heating element and burn it out. It would not fuse or burn out; it just oxidized too rapidly. It was not really necessary to use a rheostat; it was used quite often; when a rheostat was used it was in series with the input winding on the transformer and connected across the line. The rheostat was on casters. The rheostat was located close to the source of power. A step-down variable ratio transformer might have been used to reduce the voltage. Witness does not know exactly how many amperes were in the primary or secondary or how many volts it used because that was a variable depending on the heating element. Witness never made any tests to determine those factors.

The witnesses, three in number, who testified for the plaintiff that they did not use or see used the soldering device in question, were James Elegante and Orrin Vollard, who testified in open court, and Kay Hart, Jr., who testified by deposition.

James Elegante testified (R. 2235) that he lived at **Provo**, Utah, that he owned and operated a wholesale beverage (light 3-2 beer) distributing business, and that he was also in the electrical contracting and engineering business, that he had practical electrician's course at Heald Engineering College in San Francisco in 1936, that he then worked as an electrician for the Utah Fuel Company, a coal mining concern, and then entered Tri-State College in 1938 and was graduated with a bachelor of science degree in June, 1940; that while at the College he was employed by the College doing free lance work wiring, electrical work, and so on whenever they asked him to, that he was familiar with the electrical engineering laboratory at the College, that he became familiar with it because, while he was in college, all of the electrical engineering experiments were conducted in that particular room, and that after his school period he was employed by the College as an instructor and that he worked and conducted experiments or helped students conduct experiments in the electrical laboratory, that while he was a student he was employed to do work in the laboratory, that a considerable amount of work was done off and on, that possibly the largest project that was done in the laboratory itself was in the rewiring of the underground wiring for the machines which were set on pedestals in the laboratory. It consisted of removing the existing junction boxes, cutting the conduits to fit new larger forms, then the old wire was pulled and the new wire installed, lugs soldered on the new wire, connections made at the junction boxes and at the machines on the pedestals, the connections then taped and finally covered, concrete poured around the new boxes, and finally covers made and fitted over the boxes so they would be flush with the existing floor. Mr. Elegante further testified that sometime in the summer of 1939 they started work on that particular work in the laboratory, that some of the work was done by making the junction boxes larger and then witness was gone for a period of time during the summer vacation and when he returned some of the wire had been pulled into the existing conduits now encased in the larger junction boxes, and it was witness's duty to complete some of the pulling of that wire and soldering the lugs onto the wire that was there. That when witness returned from his vacation there had been no soldering work done, none of it, that all of the wire had not even been pulled;

so witness proceeded in completing the pulling of the wire and then soldering lugs onto the new wires that had been pulled, and then connecting and taping to complete the job. Witness further said (R. 2240) that he needed a soldering tool, that on the smaller wires he used a normal American Beauty soldering iron, that on the larger wires they used a particular device which had been in the laboratory, witness did not know who it was made by but that they used a device which consisted of a current transformer with 110 volts on the input side and having some leads about six feet long over a pair of home-made wooden tongs, something that looked like tongs, or a pair of scissors, with the fulcrum point at the center and opening on either end; that at the end of this particular piece of wood there were attached carbon brushes and the heavy wire from the current transformer was tied or electrically connected to the carbon brushes. That device gave them a soldering tool which was quite fast and quite efficient for the work they were doing; that witness can at this time draw a rough sketch of that device, eliminating the transformer, and witness did draw such a sketch; that witness will explain this sketch. Witness had a current transformer down at this end with approximately six feet of leads out to the carbon brushes; when the current was turned on on the input side with the tongs open there would be no current flowing in this path at all out here, and therefore no effect, but with the tongs closed, whether a metal piece was inserted between the brushes or not, there would be a current circulating, that at this point where the carbon brushes are, witness inserted the lugs, which were to be soldered to the wire and closed the tong, that then the current would flow through the lug and heat the lug to a point where you could melt solder into it, and thereby attach the wire to it, that assuming that the lug now has molten solder in it, a large piece of wire inserted in that molten solder wouldn't heat up thoroughly enough; it would only heat the surface of it, there-

by only making a bond on the surface of the wire itself, and cooling the solder to a point where it would shrink up so rapidly that the bond was not good, that if you take the wire which you are working with and work it in and out of that molten solder, you heat the wire to a point where it will take solder and the solder will flow up through the stranding and around the stranding, and thereby make a solid bond, that this device was attached to a transformer, Defendant's Exhibit D–9 could be the one, it looks like it. Witness can't say it is exactly the same one, he don't know the ratio of the transformer, he only knows of one transformer having been used with that tool. This transformer was connected to the 110-volt input supply line by means of the conventional drop-cord, piece of wire covered with rubber. Witness does not remember the length of that cord, it was possibly a fifty-foot extension cord, that no rheostat or other device of that sort was used with this particular transformer on that particular phase of the work, that the soldering of the lugs took four or five days' time at the most, that witness had help but he does not know who, witness did the majority of the work on the soldering. Professor Summers was in charge of the whole job, he assisted witness at times. Witness cannot recall that any of the other professors helped him. Professor Shaw was instructor in the laboratory at this time. He did not help witness, that witness remembers. 300 or 400 lugs were used in this rewiring job. Witness believes he soldered about 80% or better of those. He does not know exactly the size of the lugs but they were made to fit the particular cables they were working with. The size of the cable, if he remembers correctly, was around No. 2, No. 4 or No. 6. They were not all either No. 2, 4 or 6; there were some smaller wires, possibly No. 12 for 110 volt circuits. Approximately 10% of the circuits were No. 12. With these small lugs witness used the standard conventional American Beauty soldering iron. In the special tool there was not to his knowl-

edge a switch anywhere in the line from the transformer to the source of electricity or elsewhere. When you opened the tongs the current would cease to flow in that particular circuit. Witness always used carbon tips on the end of the wooden members shown in the drawing, with possibly an exception when the carbon broke, and then the wire was just wrapped around the lug as a temporary measure to save time, that was only done as a temporary measure, possibly to finish soldering one or two lugs rather than to take time to go back and make a new brush for the apparatus. These brushes were old brushes lying around the laboratory. Witness would solder one lug at a time. When he came up to one of the junction boxes he would solder all of the lugs that were in that particular box; then, he would move on to the next box. When he was in college he did their soldering jobs in connection with rewiring or wiring in other parts of the college. He did work on several of the buildings, mainly one that was being constructed during that time which is to the west of the regular old campus. He does not remember the name of that building. It later became the mechanical laboratory and the radio department. They wired some of that building. In that particular case the wires were small, something like a No. 12 or No. 14 and that was just twisted wire into the ceiling junction boxes, just twisted and soldering with a conventional soldering iron. He never used this particular special tool again while he was there. He believes it was around the building for sometime; he does not remember seeing it again at any time. He went to California after he graduated from college and went to work for the Vultee Aircraft Corporation in June of 1940. He was in the engineering department, electrical, drafting and a little designing work. He stayed there until October of 1940 when he went back to Tri-State College to teach and assumed charge of the electrical engineering laboratory. His predecessor in that job was Professor Shaw. He was there until June of 1942.

Then he went to Utah and was engaged by U. S. Steel Company in the construction of a steel plant known as Geneva Steel Company. He cannot recall that he ever saw a device of the type shown in Defendants' Exhibit NT–37 while he was in Tri-State College. He never saw it while he was a student that he knows of. He never saw it used in connection with this re-wiring job. He cannot recall that he ever saw it after the re-wiring job was over. He was in charge of the laboratory for a period of a year and a half, from November, 1940, until June, 1942. He was in charge of everything in the laboratory at that time. He never saw anything like this. He has been asked by persons representing the defendant in this case about the rewiring job at Tri-State. He believes it was Connor. His recollection having been refreshed, it was Mr. Cannon. Mr. Cannon contacted witness by telephone. He believes the first time was early spring, possibly April or May. He does not know exactly how many times he has contacted witness since that time, but it was three, four or five possibly. Each time Mr. Cannon would ask witness if he did any of the work and just, in general, questions about the same as you have been asking me now, referring to the work done in the particular lab, and whether carbon brushes were used or whether copper brushes were used, and witness believes Mr. Cannon described over the telephone something of the nature of what you have shown witness where the secondary of that transformer was closed by a small wire, and asked if witness had ever used that. Witness told him that he had not, that he had not seen it. And probably more questions witness don't remember now. In his last conversation, witness recalls Mr. Cannon mentioned several names of people who had—"I believe he said they had seen it, or something of that nature."

Mr. Elegante's direct testimony covers 22 pages of the record. His cross was searching, covers 56 pages of the record but left his story on direct unshaken.

Mr. Elegante was recalled as a last witness on behalf of the plaintiffs (R. 3040) and testified as follows:

"Q. Now, Mr. Elegante, the Summers deposition was read and this statement was made on page 2513 of the record:

'Q. Do you recall the names of any other students to whom you showed this soldering device and explained the operation specifically? A. James Elegante.'

"Now, if the soldering device which was mentioned in this question was the copper loop soldering device, is this statement correct? A. I would say not."

The witness further testified he had evidence to support his answer, that he had a letter from Professor Samuel D. Summers, who was a professor at Tri-State when he was there, that this letter was received in the regular course of mail and had been in witness' possession and control since he received it. Witness read the letter as follows:

"3940 Second, SW, Washington 24 D.C.
May the 4th, 1954.

"Mr. and Mrs. James Elegante.

"Dear Jim and Tina:

"It was a pleasure to hear from you at Easter time. The children are really growing up. It was nice to get the pictures of them and the house. Too bad we have to live so far from the people we like.

"How is the job going now? I hope you are doing well and like your work. I am in the same position since the end of the war. We like to live in Washington, and I guess we are settled here. I would like to drive to California sometime, in which case will surely plan to come by to see you.

"Mary is well and as usual working too much. Don't know how to stop her. I am not doing very well tumor trouble is increasing. Will force me to stop working, I am afraid.

"I had a visit from the patent attorney Cannon concerning the welding arrangement we used in the laboratory. I am not sure of the year nor do I recall the wire heating loop described by Shaw. I recall the carbon tips only.

"If you can refresh my memory, I will appreciate it. My sympathy is with the Weller Company anyway since they got a patent on it and made it first. He created the market for it, and the Wen Company, it would appear, are muscling in on the deal.

"I don't know how much Cannon told you about the background of the case, but the Wen Company is trying to get the patent thrown out. They lost the case in court and are appealing. Let me know what you know about the wire heating loop. Shaw says the loop looked like this [and he has a sketch with notations on it].

"Best wishes to both of you. Hope you come to see us sometime. Would enjoy having you.

Sincerely, Sam."

"By the Witness: The signer is Sam Summers. He didn't write 'Summers' but merely wrote 'Sam.' " The witness is familiar with his hand-writing. The hand-writing on this paper witness would say is Mr. Summers'. Witness has another letter with him, a letter of recommendation which was signed by Professor Summers in 1942. His signature is on it, though witness cannot say that he saw him sign it, but he gave witness the letter, a letter of recommendation 15 years ago. Witness has that letter with him. The aforesaid letter, dated May 4, 1954, was marked Plaintiffs' Exhibit 47.

"Mr. Fenwick: The letter is offered in evidence in support of the witness' answer which he has made, since it would seem that if Mr. Summers did not recall the device on May 4th he could hardly have told this gentleman about it before.

"The Court: Any objection? Mr. Cannon: No.

"The Court: It may be received."

Said document was received in evidence as Plaintiffs' Exhibit 47. The other letter, referred to by the witness and which was dated June 2, 1942, was offered and received in evidence without objection as Plaintiffs' Exhibit 48. Mr. Elegante testified on cross-examination as follows: (R. 3050):

"When he appeared and testified in this case the day before Thanksgiving, the witness had only one of the aforesaid letters with him, the one which was received in May. Witness had shown said letter to counsel for the plaintiffs and had the letter with him here at that time.

"By Mr. Cannon: I move that the letter and testimony in regard to it be stricken on the grounds that it is not proper rebuttal, the witness had the letter, knowledge of it at the time he testified here before and apparently withheld it deliberately, for some reason which we don't know.

"By the Witness: I wasn't asked for it.

"The Court: Motion denied."
Further cross-examination by Mr. Cannon:

The witness did not reply in any way to Mr. Summers' letter of May 4th. Witness has not been in touch with Mr. Summers since he received that letter. Witness did not write him any letter in response to that letter, and did not call him by telephone. Witness did not communicate with him in any manner. Witness has not discussed this letter or this case with Mr. Summers at any time since the letter of May 4th and did not discuss it with him prior to that particular letter. All that witness did was to send him an Easter card after witness received a call from counsel, Mr. Cannon, sometime in April. Witness had told counsel then that he could not remember the thing too well and witness believes he told counsel that they had used the tongs with carbon tips and witness thought that counsel was asking witness about using copper. Witness told counsel that sometimes the carbon would burn and then they would use the copper— two copper contacts but that the lug was part of the circuit or made part of the circuit when the tongs were closed and witness thought that he could maybe refresh his memory and he sent Sam Summers an Easter card and in the card witness asked him to let witness know what they had used other than the tongs, and this is the letter that witness got in reply. Witness believes he made mention of the copper tip transformer soldering device in that Easter card to Mr. Summers, though witness doesn't recall the exact wording. It was an Easter card and witness merely told Mr. Summers that witness had heard from counsel and that counsel wanted some information as to the particular wiring job in the lab. Witness did not discuss it with him at all after that. Witness doesn't recall exactly what he had on that card. Witness doesn't remember whether he made mention on the Easter card to Mr. Summers of the use of carbon brushes. All witness asked him about was the general job. The first time counsel (Mr. Cannon) called witness by telephone was before witness wrote to Mr. Summers this Easter card. Witness did not tell counsel that he had no recollection of taking any part in the re-wiring job in the laboratory. Witness remembers doing the job. Witness is certain that he told counsel that he had worked on the job and explained the tool that was used. Witness merely asked Mr. Summers to refresh witness' memory on some of the things. Witness testified that he did 80% of the soldering operation himself. Witness did not need Mr. Summers to refresh his recollection about that. Witness asked him in general what tool we had used and about some of the work. Witness is sure what was used. Witness is sure that the carbon brush was used. Witness is sure which carbon brush tool it was that was used. Counsel (Mr. Cannon) led witness to believe, or at least witness was

thinking, that counsel wanted to know whether their contact was made with carbon or with copper, and witness told counsel that it was carbon and witness believes that he asked Summers "Did we ever make a copper piece to go on the end of this tong rather than carbon, because I knew carbon did wear and did break when you dropped the tongs." So, the witness remembers asking him that, whether we had ever made a brush of a piece of copper to tie onto the end of that, and evidently he didn't answer it in his letter. But witness knew that he had used the tool and as Mr. Summers mentioned in the letter he didn't recall the loop which counsel described to witness either, the witness did not recall it. Witness wanted to be fair and was fair with counsel. Witness is sure that in his conversation with counsel witness said that he did not remember it, that he didn't use it, although it might have been, maybe it was there, maybe they used it, but "so help me, I don't remember it." What witness said in his testimony is that witness did not use it and did not see it. Maybe it was there, witness doesn't know. Witness is not prepared to say that it was not there or that it was not used for soldering. Witness has not written letters to anyone in regard to any of these soldering devices or the wiring of the laboratory since last spring, nor has witness had any telephone conversations with anybody in regard to it other than the attorneys for the plaintiffs and defendants.

Re-Direct Examination: Witness showed this letter of May 4th to counsel for plaintiffs the night before he testified here, which would make it last Tuesday, a week ago, and he had not told them about this letter prior to that time.

Orrin Volland testified (R. 2316) that he resided at Dalton, Illinois, that he was employed at Underwriters Laboratories, that he received his engineering training at Tri-State College and Thornton Township Junior College, that he attended Tri-State from the fall of 1939 to August, 1941, that when he was in college he had some outside employment by way of part time jobs, that he was employed by the N.Y.A. by a Mr. McBride and by his landlady; that the N.Y.A. work was in connection with the college, that he had employment in connection with the electrical engineering laboratory, that work was whatever might be needed in the way of decorating or helping, odd jobs in the lab. He remembers decorating, painting and also the rewiring of the laboratory. The rewiring was sometime during the period. He does not recall exactly. He was employed throughout the entire time that he was at Tri-State and it was sometime during that time, he can't tell exactly when. Witness assisted in installing some wires on that particular job. The tool used consisted of a device for gripping and heating the lug, and also to heat the solder so that you could put the lug on the wire. It consisted of two sticks crossing and attached somewhere near the center, and a pair of contact for holding the lug and for heating the lug, and a spring to help keep the contacts apart. This pair of wires were connected to some sort of low voltage since he recollects this was a low voltage operation. The witness does not remember the device to which it was connected.

"Q. I show you a sketch——

"Mr. Coms: I object to that as leading.

"The Court: Sustained.

"By Mr. Allen: Q. I will hand you a piece of paper and a pencil, Mr. Volland, and ask you to draw a sketch illustrating the device that you used at the college. Will you label, please, each of the parts of this device? Now, will you explain what each part is so it will be in the record, Mr. Volland? A. A pair of wooden handles attached at the center, a couple of electrodes at the end, a spring, and a stop. The spring was to spread or to—I think I actually have the spring in the wrong place, since its purpose was to hold the electrodes together while the stop was to keep them apart.

There was enough space between the electrodes so that they would not contact when the stop was against the wood handle.

"Q. Is there another name for those electrodes, such as carbon brush? A. Well, it could be, yes.

"Q. Now, will you explain just how you did a soldering job with that tool? A. We took the lug and placed it between the electrodes, and the stop is adjusted so that you could clamp the lug between the electrodes, and that resulted in the current flowing through the lug, which would cause the lug to heat, and then solder was placed in the lug and the heat, of course, would cause the solder to melt. When the solder was sufficiently melted, you inserted the clean end of the wire and allowed the whole thing to cool, and the lug was then in place on the end of the wire."

The sketch was received in evidence as Plaintiffs' Exhibit 34.

The witness remembers operating this device three or four times but does not recall exactly how many times. Witness entered the College in the fall of 1939. The fall term started around the end of September. Witness operated the device on wires in a raceway for making connections to the various machines in the laboratory. Witness made a dozen or so operations in the aggregate but can't remember how many operations. They were made on several different occasions, he does not know how many. These wires or cables to which witness soldered these lugs were in a trough in the floor of the laboratory at the college. These troughs were generally open for the purpose of doing the wiring. They were doing some general work of moving machinery and locating laboratory equipment and other jobs were being done. They were mounting some machinery. Another job witness had was locating lugs on the base for the mounting of machines. As witness recalls, it was in the west part of the laboratory.

Cross Examination by Mr. Ooms:

Witness' immediate supervisor in this work at the time he employed this tool he sketched was Clyde Shaw. Witness believes Mr. Shaw was directing the actual physical work that witness did. Mr. Shaw did not pull any wires through those raceways leading into the trough. Mr. Shaw did not assist in making any connections from the junctions in the trough to the machinery that was being rearranged there. Mr. Shaw did not handle the soldering tool while witness was there. Witness has no recollection of who worked on this with him (beside Professor Shaw). He does not remember the name Elegante at all. Witness met him going out of the court room as witness came in. Witness recognized the man but he didn't know his name. To witness' recollection witness never worked with him on this work. Witness knows he was at the college at the time witness was there. Witness did not work with Professor Summers on this laboratory work in 1939. He was in charge of the complete laboratory with Mr. Shaw under him. Witness knows Professor Summers. Witness knew a professor there by the name of Boagey. Witness took work from all of those people. They were all there throughout the time witness was in school. Witness has no idea who designed the tool shown in the sketch Plaintiffs' Exhibit 34, probably Mr. Shaw first presented it to witness for use. Witness had never seen anything like it before. Witness had done soldering before with a conventional soldering iron. Heavy gauge insulated wire led to these brushes at the working end of this tool shown in Plaintiffs' Exhibit 34. It was about 6 to 10 feet long possibly. It entered the tool at the far end directly at the brush. The electrode at the end of the wooden handle was carbon brush, possibly three inches long and a quarter inch square possibly. It was held to this wooden handle by a metal bracket and set screws, either to the side or the ends of the metal brackets, so that it could be adjusted. Witness doesn't recall whether the wire

ran into the electrode as he has drawn it here or whether it ran along the handle into the electrode. The wooden handles were 12 to 14 inches long, possibly. Witness has seen a sketch of this device before he drew it today. Mr. Allen showed it to him. It did not have the spring in it, it did not have a stop in it. It did not have the wires leading into those brushes at the same place. Witness' sketch is what he feels is the correct version. Witness has no idea where those leads that brought the current to the tool shown in Plaintiffs' Exhibit 34 came from as a power source. Witness used this tool on three or four occasions possibly. As witness recalls you did not have to turn the electricity on but the one time and after that, because of the stop, you could remove the part, and for that reason witness didn't have many occasions to turn the power on. In some ways that was a quite unique instrument that witness was using. Witness had never seen anything like it before. It was quite different from the conventional soldering irons. When witness used the soldering iron he would usually put the plug into an outlet for conventional 110–volt power. If one laid the instrument down, the instrument would be held closed but the stop would interfere with the brushes coming into contact. To heat up a lug for a 35 ampere connection to receive solder, melt the solder, and receive the conductor that one were introducing into that lug would take from 30 seconds to two minutes. Witness doesn't recall whether he had assistance or did it alone on some occasions. Witness thinks he did it alone on some occasions and at other times he had assistance but he doesn't remember who helped him with it.

Kay Hart, Jr., testified (R. 2608) as follows: That he lives at Anderson, Indiana, that he is by occupation a technical writer for Delco-Remy of Anderson, Indiana, that he is 36 years of age, that he received his technical education at Tri-State College at Angola, Indiana, that he was at Tri-State during the period from 1936 to 1940 (there is in evidence a stipulation that the College records show that Mr. Hart was in Tri-State College in the winter term of 1939, that he skipped the spring and summer terms and started again in the fall of 1939). The witness did not attend the summer sessions at the College but he attended the fall and winter terms and some of the spring terms. He was in college during the fall of 1939. There was rewiring done at the College while witness was there. The witness is not positive whether or not it was in 1939. The rewiring, as witness remembers it, was of cables under the floor in the electrical engineering laboratory. All that witness remembers is what he was doing and that was soldering lugs onto the ends of the cables. Witness was working his way through school on the N.Y.A. program and that was one of the jobs assigned to witness. From what witness remembers he believes the device with which he was doing this soldering was made out of sticks the shape of a pair of pliers with carbon brushes with leads coming off the carbon brushes to the transformer. The leads were attached to the transformer. The witness does not remember to what the transformer was connected. The tool was used on a table where the soldering work was being done. Witness is not sure where the transformer was but the pliers were on the table. The job was done there. The cables were pulled out of the conduit. The ends were on the table so they could be soldered. The photographs shown to me, marked Defendants' Exhibit B, shows a type of transformer similar to the one used. Witness cannot say that was the transformer. Referring to Defendants' Exhibit A, which is attached to affidavits on file in this case, one of the sketches shows the tool which witness used at that time. Witness is referring to the sketch under which is the name Clyde E. Shaw July 13, 1954. Referring to the other sketch that looks very much like the transformer but witness does not remember ever seeing the copper soldering tip on it. Witness is referring to the triangle shaped member

at the upper left-hand corner of the drawing. Witness would imagine that the transformer weighed at least five pounds but would not say it weighed 50 pounds. It was not more than 5 or 6 inches square, referring to the body of the transformer. Referring to the drawing in the lower right-hand corner of this Exhibit 1, witness has previously referred to as the tool he used, the witness does not remember of what material the wire was made. The pivoted members were wood. The members at the top ends of the handles were carbon. Witness thinks they were carbon brushes. The cables were somewhere between 3, 4 or 5 feet — — maybe not that long. Witness does not remember how many days he worked on the project. He worked more than once. He can't tell whether he worked more than twice. Witness did solder some lugs to the ends of the cable with this tool; he does not remember how many. The work had to be done in the fall or spring probably. Witness was not there in the summer. Witness never came back to school in the vacation period between summer and fall sessions and do any work. The first time since he left Angola that he remembers anything connected with this tool was when counsel (Mr. Allen) called him up about two months ago. During the time witness was at Angola he never heard Professor Shaw or Professor Summers discuss this tool in any of their classes. Witness would not say that the tool looked exactly like the sketch. Witness thinks that maybe a spring is missing. The function of the spring was to hold the brushes apart. When the tool was operated the brushes made contact with the lug. The current flowed through the brushes into the lug, and heated the solder in the lug, and the end of the cable was put in the lug. Witness does not remember how the lug was held. Witness is not sure whether the lug was held by the brushes or by some other means. It seems it was held with the soldering tool. If witness remembers rightly, the lug was contacted on both sides by the brushes and that made the circuit, then when the lug was removed the circuit was broken. Witness worked with another fellow who helped him but Mr. Shaw was around when they were working. Mr. Summers was around but never in there when witness was working; he was teaching there. Witness could not think of the name of this other person with whom he worked until counsel (Mr. Allen) mentioned it tonight— Orrin Volland—he was another student.

Mr. Hart was cross-examined but his testimony on direct remained unshaken.

The plaintiffs took the depositions of six other persons—three teachers in Tri-State College and three former students. Some of them could not remember the re-wiring of the electrical engineering laboratory, some of them did, five of them never heard of any special tool which was used in the soldering and the re-wiring job, one of them heard Professor Shaw discuss such a tool but he could not describe the tool and could not say that the device shown in the numerous sketches of the carbon type device was the device referred to. Accordingly, these six witnesses added practically nothing to the case.

There has been presented a wealth of evidence as to some facts that on this motion and trial are either undisputed or, if disputed, are so well established as to be beyond dispute. Among them are these: There was in Angola, Indiana, in 1939, and before and since, a college known as Tri-State; it possessed a campus and various buildings, including a building known as the engineering building, and in this buildng was a room or rooms known as the electrical machinery laboratory; that sometime during 1939 the machines in this laboratory were re-wired; that in 1939, Samuel D. Summers was professor of electrical engineering, and Clyde Edgar Shaw was an instructor in the electrical machinery laboratory; that all of the fact witnesses were either teachers or students in Tri-State College in all or part of 1939. As has been indicated, testimony concerning these facts was voluminous. It does not bring us near the alleged prior use, however.

There does not seem to be any doubt that a tong-like arrangement, made of two wooden strips joined at or near the middle, with carbon brushes at the ends of the tongs, and with flexible cables extending from the carbon brushes to the transformer, was used to solder lugs to the cables in the re-wiring operation. Shaw testified concerning this device at Record 2552 et seq. Summers testified at Record 2499 that they used "carbon terminals for a specific case once or twice" but not at first. Collins testified as to the use of these tongs at Record 2071. Boagey testified he saw the tongs lying around the buildings at Record 2127. Elegante testified to the use of these tongs at Record 2240, Vollard at Record 2318, and Kay Hart, Jr., at Record 2611.

On the question as to whether or not a soldering device, consisting of a step-down voltage transformer and a copper wire heating element, connected across the secondary or low voltage side of the transformer, was used in a re-wiring operation in the electrical machinery laboratory at Tri-State College in the summer or fall of 1939, the evidence is sharply conflicting. There are no contemporary photographs or drawings in evidence. There is not a scrap of contemporary written or printed evidence bearing one way or the other on this issue. The device, if it ever existed, was not used in more than one job and that in 1939, was then put aside, and many years ago was dismantled. No one, other than Shaw, has identified the transformer that was claimed to have been used and his testimony is so contradictory as to be wholly unreliable. The other witnesses who claim to have seen the device could not and did not identify the transformer. No other part of the device has been identified by anyone. The evidence with respect to this alleged use is exclusively oral and based on a memory of something claimed to have existed and to have been used fifteen years before the testimony was given. Photographs and drawings made in 1954 were introduced in evidence, but they can rise no higher than their original source, and their source was Mr. Shaw's memory and veracity.

Mr. Clyde E. Shaw, who was the principal witness for the defendants on this motion and trial and who, as has been indicated, by his letter of March 8, 1954, initiated this proceeding, concluded that letter with the words "If I can be of any help to you I shall be glad to do so." Mr. Shaw is a man of considerable formal education, whose manner evidenced his long experience as a teacher, and indicated that he was accustomed to dealing with immature minds. He enjoyed "talking down" to counsel. He enjoyed the role of witness. He seemingly felt that, having enlisted on the side of the defendants, it was his duty to help them in every way that he could, and he was obviously "glad to do so." He was, accordingly, a voluble witness, but his tongue frequently out-ran his mind, which is not extraordinarily agile, with the result that his testimony contains many inconsistencies and contradictions.

Mr. Shaw's testimony with respect to the use in the summer or fall of 1939 in the re-wiring of the electrical engineering laboratory of a soldering device consisting of a stepped down voltage transformer and a copper wire heating element connected across the secondary or low voltage side of the transformer is corroborated by testimony of Milford Edward Collins, Thomas Boagey, Robert C. Arner, and Samuel D. Summers. Mr. Collins, Mr. Boagey and Mr. Summers had been teachers with Mr. Shaw in Tri-State College. Mr. Arner had been a student under Mr. Shaw at the college. Mr. Shaw had made an affidavit on April 21, 1954, to which was attached, as Defendants' Exhibit A, a drawing of the device claimed to anticipate, which bore the following notation in what appears to be Mr. Shaw's handwriting, "Drawn at Angola, Indiana, April 20, 1954, Clyde E. Shaw." Boagey and Arner made their affidavits on May 3, 1954, Collins made his on May 15, 1954, and Summers made his on May 22, 1954. The Shaw drawing was ex-

hibited to each of Boagey, Arner, Collins and Summers at or before the time of the signing of their respective affidavits, and the Shaw affidavit was exhibited to Summers at the time he signed his affidavit. Summers did not apparently sign his affidavit, the first time it was presented to him. This is indicated by his letter (Defendants' Exhibit I to Mr. Cannon's affidavit). In this letter, which is dated May 19, 1954, Mr. Summers said:

"If you are still interested in my affidavit concerning the soldering device, I shall be glad to sign it. Unfortunately, I have lost Mr. Dent's telephone number and cannot call him to ask that he send it out to me. It will not be necessary for him to bring a notary out for the witness, as we have one in our office."

This letter and Mr. Summers' testimony indicate that he had made up his mind to sign the affidavit as it was written. He testified that no changes were necessary in it.

As has been indicated, three witnesses, Elegante, Volland and Hart, testified to the use by them of the tong-like instrument with carbon brushes for soldering the lugs on the cables. Elegante testified that he soldered 80% of the lugs himself. That statement, standing alone, seems reasonable. He was an experienced electrician. He had worked at the trade. So far as the evidence in this case discloses, he was the only electrician of any considerable experience amongst the witnesses. Elegante and Hart never saw the device with the copper soldering tip on it, and Elegante was in charge of the laboratory from 1940 to 1942.

The court has come to the conclusion that the soldering device with a copper tip was a figment of the imagination of Clyde E. Shaw, that it never existed any place else, that Shaw, who was a distributor of the products of the defendant Wen Products, Incorporated, offered to help that company, that he probably went further than he originally intended, when he found that to help he would have to remember a copper tip. The court has concluded that the minds of Collins, Boagey and Arner were stimulated to memory of something that never existed by the Shaw drawing of April 20, 1954. The court has concluded that Summers' mind was stimulated to memory of something that never existed by the Shaw drawing of April 20, 1954, and the Shaw affiadavit of April 21, 1954. Finally, with respect to this unpleasant part of this case, the court, having seen and heard Shaw, Collins, Boagey and Arner, is of the opinion that Shaw did not tell the truth and knew that he was not telling the truth with respect to the alleged use of a copper heating element; that Collins, Boagey and Arner did not tell the truth with respect to the alleged use of a copper heating element but persuaded themselves that they were, and, when they testified, thought that they were; that Summers did not tell the truth with respect to the alleged use of a copper heating element but since Summers testified by deposition the court does not venture to say whether he did so knowingly or otherwise; that Elegante, Volland and Hart did tell the truth with respect to the use of the tong-like soldering iron with carbon brushes.

The court concludes that in the re-wiring of the electrical machinery laboratory at Tri-State College in 1939 a tong-like soldering iron with carbon tips was used and that a soldering iron with a copper heating element was not used.

The defendants have had the new trial which they sought and this case should be concluded in this court as speedily as possible. Accordingly, counsel for the plaintiffs are requested to prepare and submit to this court, not later than Monday, April 11, 1955, drafts of findings of fact, conclusions of law, and a judgment order, not inconsistent with the views hereinabove expressed.

Supplemental opinion.

After counsel for the plaintiffs submitted drafts of findings of fact, conclusions of law, and a judgment order, together with proof of service of same on

counsel for the defendants, the court, on April 12, 1955, received from counsel for the defendants a letter, the body of which letter is as follows:

"Your attention is respectfully directed to the fact that the second numbered paragraph of the proposed Judgment, filed by Plaintiff on Monday, April 11, 1955, is not in accordance with the Court's opinion of April 1, 1955.

"Paragraph 2 of the Judgment states that '* * * * defendants' motion for a new trial is therefore denied * * *', whereas it is stated at page 54 of the Court's opinion [135 F.Supp. 145] that 'The defendants have had the new trial which they sought * * *'.

"It is respectfully submitted that the denial of the motion for a new trial should be stricken from the proposed Judgment.

"Two copies of this letter are being mailed today to J. Rex Allen Esq., attorney for Plaintiff."

As was stated in the memorandum filed April 1, 1955, when on June 18, 1954, the defendants presented to this court their motion for a new trial based on newly discovered evidence, this court fixed upon October 11, 1954, as the time for hearing the motion for new trial based on newly discovered evidence and for a trial and advised counsel that the court would on that date hear everything desired to be presented on the motion for new trial and on a new trial so that, in any event, one hearing would cover the matter. The court was not able to take the matter up on October 11, 1954, or at any time until November 18, 1954, when the matter came on for hearing on the motion for new trial based on newly discovered evidence and for trial. As recited in the memorandum aforesaid, the court, having heard everything that either party desired to present, arrived at the conclusions which were set forth in said memorandum and which are embodied in the drafts of findings of fact and conclusions of law presented on April 11, 1955, which are now being signed and filed by the court.

This being the state of the record, the court having heard everything that was desired to be presented by either party both on the motion for new trial and on a new trial if one were warranted and having come to the conclusion that the alleged newly discovered evidence did not warrant the granting of the motion for a new trial, concludes that the changes suggested by counsel for defendants in the proposed judgment order are not necessary and that the judgment properly denies defendants' motion for a new trial.