**WELLER MFG. CO.**

v.

**WEN PRODUCTS, Inc. et al.**

No. 52 C 714.

United States District Court,
N. D. Illinois, E. D.

Jan. 19, 1954.

John Rex Allen, Chicago, Ill. (Charles R. Fenwick, Thomas B. Van Poole, Mason, Fenwick & Lawrence, Washington, D. C., Schroeder, Merriam, Hofgren & Brady, Chicago, Ill., of counsel), for plaintiff.

Charles B. Cannon, Daniel V. O'Keeffe, Wallace & Cannon, Chicago, Ill., Robert E. Burke, Burke, Craven & Crane, Chicago, Ill., for defendant.

BARNES, Chief Judge.

This is an action by the plaintiff, Weller Manufacturing Company, a limited partnership consisting of the general partners Carl E. Weller, Emily I. Weller, Everett C. Weller and Robert E. Miller, having a place of business at Easton, Pennsylvania, against the defendants, Wen Products, Incorporated, an Illinois corporation having a place of business in Chicago, Illinois, and Nicholas T. Anton, president of the defendant corporation, charging infringement of reissue Patent No. 23,619 granted February 10, 1953 on "Electrical Heating Apparatus" in the name of Carl E. Weller, as patentee, on a reissue application Serial No. 298,219 filed July 10, 1952, for the reissue of original Patent No. 2,405,866, issued August 13, 1946, on an application Serial No. 402,372, filed July 14, 1941. The original complaint in this suit was filed on April 1, 1952, jointly by the present plaintiff, Weller Manufacturing Company, and a second plaintiff, Weller Electrical Corporation, a Pennsylvania corporation (no longer a party to the suit), and charged infringement by both of the defendants of all four claims of the original Weller Patent No. 2,405,-866.

As above stated, on February 10, 1953, the reissue Patent No. 23,619 was granted. On February 17, 1953, the plaintiffs filed an amended and supplemental complaint, in which they substituted the reissue Patent No. 23,619 for the original Patent No. 2,405,866. The defendants thereupon filed an answer to the amended and supplemental complaint and a counter-claim requesting a declaratory judgment as to the reissue Patent No. 23,619, and the plaintiffs, in due course, filed their reply to the defendants' counter-claim. Thereafter, in reply to interrogatories, the plaintiffs stated that they would rely at the trial upon all of the eleven claims of the reissue Patent No. 23,619 as having been infringed by both of the defendants.

The trial commenced on Thursday, October 15, 1953, and the taking of testimony was concluded on Tuesday, October

27, 1953. Thereafter, briefs were filed and final arguments were heard on December 21, 1953.

Carl E. Weller is the inventor. The plaintiff, Weller Manufacturing Company, is the owner of the original Weller patent and the reissue patent. It is the manufacturer of Weller soldering guns made and sold under the original Weller patent and the reissue patent. It and its predecessors have manufactured soldering guns under these patents since early 1942.

The defendant, Wen Products, Incorporated, is the manufacturer of Wen soldering guns, which are alleged to infringe the reissue patent in suit. It began making the accused soldering guns in October, 1951. The defendant was given notice of the infringement of the patent by letter shortly after the first sale of the accused device. The defendant corporation was organized for the sole purpose of manufacturing the accused soldering gun. Nicholas T. Anton is president of the corporate defendant and was the moving force in its formation. He owns and controls all of the stock in the corporation and determines its policy.

The testimony shows that Carl E. Weller was, from 1932 to 1942, primarily engaged in the repairing of radio receiving sets. During this time he assisted in the operation of a small coil and transformer winding shop. As a radio repairman he often visited customer's homes and examined radio receiving sets and, if possible, made the repairs there. A soldering tool was an essential in this work. In order to use a detection instrument, such as a meter, to determine whether a short circuit existed in the radio; it was necessary to unsolder parts to insert the meter in the circuit. If the meter showed no short circuit, the repairman would resolder the connection and repeat this procedure at other points. This often called for many soldering operations. The radio chassis contains a maze of wiring, and the soldering tool has to be inserted between the wires carefully so as not to burn the insulation. The only electric soldering tool used prior to 1941 is exemplified by the so-called "American Beauty" soldering iron. This soldering iron is provided with a core of high electrical resistance wire extending out from the handle, and this core is placed directly across the 120 volt supply that is available in the normal commercial outlet socket. The heat that is produced in this core is conducted and radiated through the supporting member for the core and through an enlarged barrel that surrounds it into a larger copper soldering tip or peen which is in the form of a rod, the rear portion of which projects back into the heating element, that is, the core of high electrical resistance wire. This large peen stores up the heat which it collects by radiation and conduction from the heating element, so that a large supply of heat is available in the peen to flow into the work and the solder when it is placed in contact with the work. There are several disadvantages to this type of soldering iron. The principal disadvantage is the time required for this tool to heat up and cool down. In the usual case, approximately four to five minutes is required for this tool to heat up to a temperature at which it will melt solder. That is because the high resistance heating element has to supply heat to a large mass of copper, and, in order to bring the mass of copper to the 500 to 700 degree temperature necessary to perform a soldering job takes not less than four to five minutes. After the job has been finished and the switch is turned off a period of approximately eight to ten minutes is required before this very hot element can cool down to a safe storing temperature. Furthermore, this tool, lying around in a heated condition, is a serious fire hazard.

The testimony discloses that Carl E. Weller, the inventor of the patented device, in his work as a radio repairman, observed the disadvantages of the earlier soldering iron and resolved to try to eliminate them. His efforts along this line led to the development of the soldering tool covered by the patent in suit.

Weller realized that, to develop the ultimate speed in the soldering tool, the peen should be heated by putting a current through that portion of the device. This was just the opposite of the technique employed in the prior soldering iron in which the current was fed through the high resistance heating element and no current passed through the soldering peen proper, which merely collected the heat from the heating element.

A number of other problems and difficulties had to be overcome to utilize a self heated soldering peen which would be quick heating. Significant among these was the problem of selecting an appropriate small size for the soldering tip which could be heated up very rapidly but which would supply the large quantities of heat necessary to keep solder melted. Weller discovered that high resistance materials could not be used in the peen since they were such poor conductors of heat that the heat present in the tip could not be withdrawn fast enough.

Coming to a realization that a material which was by its nature an extremely good conductor of heat was essential for the peen of the proposed soldering device, Weller explored the possibilities of using copper in the tip. The idea of using copper in a soldering tip in which heat was to be generated was directly contrary to typical thinking of the times in regard to the use of copper in electrical circuits. Copper is the best electrical conductor of all readily available materials. Consequently, copper was used in an electrical circuit when it was desired to keep the conductor cool while it was transmitting current. When heating is desired, the normal material to turn to is a high electrical resistance material. To heat up the soldering tip which is of copper, and, therefore, a good conductor, requires a very high current. Since the soldering gun had to be adapted for use in the home, as well as the work shop, the source of power that could be used would have to be the 120-volt supply which is found in the conventional home. Since transformers cannot withstand temperatures of 450 or 500 degrees, which are required to melt solder, some provision had to be made to prevent the rapid flow of heat back from the self-heated soldering tip because the conductor which would supply the heat to the copper tip would be copper.

Weller's efforts to overcome these problems in using copper material as the self-heating soldering tip resulted in the device disclosed in the reissued patent in suit. The parts of the soldering gun disclosed in the patent are mounted in a pistol-shaped housing, which surrounds all the parts (except the tip) and is provided with a handle portion at the end, from which projects a cord to go to the usual outlet socket. In the central portion of the pistol-shaped housing is a transformer, which is an electrical device consisting of an iron core having two sets of wires wound in the form of turns about it. To one of them, which is known as the primary core of the transformer, power is supplied. The other is known as the secondary core of the transformer. Through it power is drawn from the transformer. The primary core of the transformer is connected with a switch, which is projected from the front of the handle. The switch turns on the supply of electricity, so that whenever the index finger of the operator is pulled, the current will flow in the circuit. The current of 120 volts and one-half an ampere which is supplied to the primary winding of the transformer is converted to a current of approximately one-fourth of a volt and 200 amperes across the secondary winding. This very high current is let out through the secondary coils of the transformer which are of very large cross-section. They are made of large cross-section because such a large current is flowing in the circuit that they must be large enough not to heat up when the current is flowing. They must be kept cool or the transformer would be damaged. These large cross-section electrodes, at their outer ends, terminate in connecting terminals by which a very small cross-section copper wire tip is detachably con-

nected thereto. The high current flowing in this copper wire tip is sufficient to generate heat very rapidly in the tip. The circuit resistance is very low, since the circuit is all formed of copper. The current will consequently be at a maximum, since as resistance decreases in an electrical circuit the current flowing in the circuit will normally increase, and *vice versa*. If the very high current, which initially flows in the circuit as soon as the trigger is pulled, were to continue on for a long period of time it would over-work the transformer and cause it to heat up and burn out. However, there is a characteristic of copper material which is extremely important to the successful operation of this device. That is, when the temperature of copper increases its electrical resistance increases in approximately a direct proportion. That is known as its temperature coefficient of resistance. As heating initially flows in this small cross-section copper tip, the resistance begins to rise as the temperature of the tip rises. As that resistance rises, the amount of current flowing in the circuit is reduced, but it starts off with a very fast or high surge of current. As it begins to approach the melting point of solder, the resistance of the copper material at that point has increased enough so that the current is lowered, the rate of heat is lowered, and the transformer is no longer in an overworked condition. Also, it is not necessary to heat up the entire length of the wire heating tip of this device. The large cross-section electrode, being larger, will drain a considerable portion of the heat off of the legs of the small cross-section tip adjacent to the large cross-section electrodes. Since these are cooler, their electrical resistance is less. However, the length of the tip and the small cross-section is sufficient so that the heat at the outer portion of the tip, the end which is to be applied to the work, cannot flow back nearly as rapidly to the large cross-section electrodes as the heat is being generated in that end portion. Consequently, the principal concentration of heat is at the outer end of the tip where it can very rapidly flow though the copper tip into the work when the tip is applied to the solder and to the points to be soldered.

Another feature that this temperature coefficient of resistance brings in is that the electrical current flowing in a closed electrical circuit is the same at every point of the circuit at a given instant of time, even though the resistance of one point in that loop circuit may be greater than the resistance at another point. However, the heat generated at any point in the circuit is proportional to the product of the current squared times the electrical resistance. Since the outer portions of this tip remain relatively high in temperature, while the portions next to the wire electrical circuit portions are cooled, the resistance of the outer portions increases as their temperature increases and the amount of heat produced at the end of the tip is consequently greater.

One other factor is worthy of note,— during the operation of this tool, when the tip is placed in contact with the work, a large amount of heat rapidly flows out of the tip into the work. Because the work is much cooler, it attempts to bring the temperature of the work up to the melting point of solder. Since the tip is copper, it will conduct the heat very rapidly, which is a desirable condition. As the tip cools down, its electrical resistance is lowered, again permitting more current and, therefore, more power to flow into the secondary circuit, so that the speed of generation of heat in the tip is again increased, and, as a matter of fact, since the increase in power will be proportional to the decrease in the temperature of the tip, it will consequently be proportional to the amount of heat which the work requires, so that it serves as an automatic control element of a sort, which will call in greater amounts of power into the tip to heat it up more rapidly, dependent upon how much heat is being drawn from the tip.

The patentee included the following material, which did not appear in the

original patent, in the specifications of the reissue patent:

"The high current of approximately 200 amperes flowing through the secondary comprising the secondary winding 30 and copper tip 12 produces rapid heating in the tip 12 because of the pronouncedly smaller cross section of the tip. Heating in the secondary winding 30 and the forward extensions 43 thereof is minimized because of their relatively large cross section. It will be observed that the divergent shanks 61 and 61a of the small cross section copper tip 12 impede the flow of heat from the outer extremity 60 of the tip to the secondary extension 43 because of the substantial thermal resistance of the shanks 61 and 61a, while the larger cross section extension 43 serve to rapidly dissipate the heat generated in the shanks 61 and 61a of the tip 12, thus maintaining the outer extremity 60 at a relatively higher temperature than the shanks. Since the copper material of the tip inherently has a high temperature coefficient of resistance, the higher temperature of the outer extremity 60 increases its resistance relative to that of the shanks 61 and 61a thereby increasing the speed of heating at the outer extremity 60 and providing the greatest heat at this point where it is readily accessible for delivery to the work.

"It will likewise be observed that the reduction in the temperature of the outer extremity 60 of the tip 12, when the tip is placed in contact with the work to be soldered and heat is drained therefrom into the work, produces a proportional reduction in the resistance of this outer extremity region 60, thereby increasing the power delivered to the secondary circuit and the speed of heating of the tip. Since this highly heated portion is confined to a small section of the tip at the outer extremity 60 thereof and therefore has a low thermal storage capacity, this adjustment in resistance and power delivered to the tip when the tip contacts the work is quite rapid."

This material is followed in the reissue patent by the following paragraph which did appear in the original patent:

"From the foregoing it will be observed that the conventional alloy tips are dispensed with. By substituting copper wire for alloy tips tinning of the tip is facilitated. The copper material of the tips is quite cheap and deterioration is readily corrected by replacing the tip. Replacement of a copper tip is easily accomplished since it is necessary only to loosen plugs 52 and withdraw the old copper tip. The ends of the new copper tip may then be inserted through axial bore 58, the turned up ends 62 and 62a being then rigidly tightened into position by taking up on plugs 52, the soldering iron being thus almost instantly ready for use. Preferably the secondary winding at the transformer side of wall 45 is much heavier than the wire of tip 12."

The first four claims of the reissue patent (they are believed sufficient for an understanding of the patent) are as follows:

Matter enclosed in parenthesis appears in the original patent but forms no part of the re-issue; matter printed in italics indicates additions made by re-issue.

"1. An electrical heating apparatus comprising a quick-heating soldering iron including a stepdown transformer having primary and secondary (turns) *windings,* said secondary (turns) *winding* being of pronouncedly greater cross-sectional area than said primary (turns) *winding,* and a detachable heating tip *of a highly electrically and thermally conductive readily tinnable material* rigidly mounted and held tightly in electrical communication (with) *across* the secondary winding, said heating tip being of pro-

nouncedly smaller cross-sectional area than the secondary winding.

"2. An electrical heating apparatus comprising a quick-heating soldering iron including a stepdown transformer having primary and secondary (turns) *windings*, said secondary (turns) *winding* being of pronouncedly greater cross-sectional area than said primary (turns) *winding,* a detachable heating *soldering tip of a highly electrically and thermally conductive material* held tightly in electrical communication (with) *across* the secondary winding, said heating tip being of pronouncedly smaller cross-sectional area than the secondary winding, and a threaded take-up connection for rigidly connecting the detachable soldering tip electrically to communicate with the secondary winding.

"3. An electrical heating apparatus comprising a quick-heating soldering iron including a step-down transformer having primary and secondary turns, said secondary turns being of pronouncedly greater cross-sectional area than said primary turns, a detachable tinnable copper heating tip rigidly mounted and held tightly in electrical communication with the secondary winding, spaced integral offset portions on said tip, said tinnable copper tip being of pronouncedly smaller cross-sectional area than said secondary winding, spaced fixed plugs maintained tightly in electrical communication with the ends of the secondary winding and each having a transverse recess for receiving an offset portion of the tip, and threaded take-up means in each plug for rigidly mounting the tip therein.

"4. A quick-heating soldering iron having spaced end portions, a center portion therebetween, a stepdown transformer having primary and secondary windings in the center portion, a pistol-grip containing an off-on trigger switch on one of said end portions, said switch for controlling said transformer, spaced secondary winding extensions fixed in the other of said end portions, and a detachable substantially V-shaped *copper* wire heating tip held tightly in electrical communication with the secondary winding extensions and projecting from the last-mentioned end portion, said heating tip being of pronouncedly smaller cross-sectional area than said secondary winding extensions; and a casing for the central portion enclosing said transformer."

The plaintiff has manufactured and sold several forms of the patented device. Each of the devices manufactured by the plaintiff has enjoyed remarkable commercial success. The testimony discloses that the Weller soldering gun has almost completely supplanted the earlier types of soldering irons among radio repairmen. For several years, electrical parts distributors have sold approximately nine soldering guns for every old-fashioned soldering iron sold to radio repairmen. Furthermore, the soldering gun has made serious inroads on the sales of the old-fashioned soldering tools to soldering tool users generally.

After the Weller soldering gun had been on the market for nine years and after the Weller improved soldering gun of the type illustrated in Plaintiff's Exhibit 8–A had been on the market for more than a year and a half, and when the plaintiff's annual sales of the Weller gun were in excess of one million dollars, one of the defendants, Nicholas T. Anton, designed a soldering gun and set up the corporation, Wen Products, Incorporated, the other defendant, for the purpose of manufacturing and selling the soldering gun designed by Anton.

Plaintiff promptly and on October 9, 1951, five days after defendant had stated it sold its first gun, gave defendants actual notice of the patent. The defendant Nicholas T. Anton testified, on adverse examination, that he is president of Wen Products, Incorporated, the other defendant, which was incorporated in

June or July, 1951, for the purpose of manufacturing and selling soldering guns. That corporation now manufactures the accused device and an electric sanding machine. When that corporation was formed it manufactured nothing other than the soldering gun. Anton owns or controls all of the stock of the Wen Products, Incorporated. Prior to his forming Wen Products, Incorporated, neither he nor any company with which he was connected manufactured a soldering tool. He commenced designing the accused device sometime in the spring of 1951. He had a Weller soldering gun in his possession when he was designing the accused device.

The first question to be considered is that of the alleged infringement of the Weller re-issue patent in suit by the Wen soldering gun. Reference to defendants' charts DX 57–9, which relate to the infringing of the claims of the patent in suit, indicates that only Claims 3, 4, 10 and 11 are claimed not to be infringed. Since no charts or testimony were introduced claiming non-infringement of Claims 1, 2 and 5 to 9, inclusive, it is inferred that the defendants concede infringement of those claims. Ten of the eleven claims in suit, namely, Claims 1 and 2 and 4 to 11, both inclusive, read directly upon the accused device.

At the trial considerable time was devoted to the study of Claim 3 of the original patent and Claim 3 of the reissue patent (they are identical) and to the question of their infringement. The briefs and oral arguments likewise featured the same subjects. In order to study the claim, it is set forth again, as follows:

"3. An electrical heating apparatus comprising a quick-heating soldering iron including a step-down transformer having primary and secondary turns, said secondary turns being of pronouncedly greater cross-sectional area than said primary turns, a detachable tinnable copper heating tip rigidly mounted and held tightly in electrical communication with the secondary winding spaced integral offset portions on said tip, said tinnable copper tip being of pronouncedly smaller cross-sectional area than said secondary winding, spaced fixed plugs maintained tightly in electrical communication with the ends of the secondary winding and each having a transverse recess for receiving an offset portion of the tip, and threaded take-up means in each plug for rigidly mounting the tip therein."

The evidence shows that the Weller invention is found in the following elements of Claim 3:

(a) a step-down transformer having a primary and secondary turns

(b) said secondary turns being of pronouncedly greater cross-sectional area than the primary turns

(c) a detachable tinnable copper heating tip rigidly mounted and held tightly in electrical communication with the secondary winding

(d) said tinnable copper tip being of pronouncedly smaller cross-sectional area than said secondary winding.

The following parts of Claim 3 merely describe in detail one sort of satisfactory electrical connection:

(a) spaced offset portions on said tip

(b) spaced fixed plugs maintained tightly in electrical communication with the ends of the secondary winding

(c) and each having a transverse recess for receiving an offset portion of the tip

(d) and threaded take-up means in each plug for rigidly mounting the tip ondary winding.

The evidence shows that there are many sorts of satisfactory electrical connections. At this late date there is nothing new in any of them. The defendants do not use the specific electric connection detailed in Claim 3 but they use its full equivalent and for the same purpose.

The defendants further contend that the transformer in. defendants' soldering gun does not have secondary "*turns*" but

has *less than one turn* in the secondary. The difficulty with this argument is that we are not studying mere "words." We are studying the application of electricity, and from that viewpoint there is no difference between "turns" and "turn." Each has reference to a secondary winding in a transformer.

The defendants argue that Claim 3 cannot be interpreted as the plaintiff contends and as the court is now construing it because to do so would be to recapture the subject matter of cancelled "and admittedly unpatentable" Claim 17 of the original application. The plaintiff answers that defendants' contention that Claim 17 was admittedly unpatentable is not supported by the file wrapper. Plaintiff points out that the patentee appealed broader Claims 14 and 15 of that application (Claims 1 and 2 of the original Weller patent) to the Patent Office Board of Appeals and obtained allowance of these broader claims, thus refuting any suggestion that his cancellation of narrower Claim 17 constituted an admission of its unpatentability. The court agrees. Furthermore, Claim 5 of the reissue patent is substantially identical with original application Claim 17.

█ The court is satisfied that the accused device infringes each and every of the eleven claims of the reissue patent.

The only patents referred to in defendants' brief as anticipating or otherwise invalidating the Weller reissue patent in suit are: French Patent No. 787,065 to Tugendhat, Helle Patents Nos. 1,802,079 and 1,816,115, and Cannell Patent No. 445,648. Perhaps it should be sufficient to say that these patents and others were considered by the Patent Office and that the reissue patent was issued over them. They will, nevertheless, be briefly considered.

The French Tugendhat patent occupied a considerable portion of the time of counsel and the other experts on the trial. The court does not believe it is necessary to spend much time on it. In Tugendhat, the patentee says: *(Italics supplied)*

"In order to achieve the highest possible intensity of heat production at the tip of the iron, this point is rendered as narrow as possible and consists of a *material having a very much higher specific electric resistance* than the remainder of the secondary circuit."

On the other hand, in each and every of the eleven claims of the patent in suit it is provided either that the tip shall be of "a highly electrically conductive material" or of "copper", which the evidence shows is one of the best conductors known. Furthermore, Tugendhat's drawings show that he proposes to have a copper peen beyond the "material having a very much higher specific electric resistance." So that there is justification for the plaintiff's statement that Tugendhat shows merely a modified "American Beauty" soldering iron. These two facts, coupled with the fact that the Patent Office considered and rejected the Tugendhat patent, certainly warrant this court in rejecting it as an anticipation or as otherwise invalidating the Weller reissue patent.

In the court's opinion, Helle Patents Nos. 1,802,079 and 1,816,115 do not help the defendants. In each of these patents a transformer is shown. All the other elements of an anticipation exist only in the imagination. It is interesting to note that on the same date that Helle filed his application in the United States Patent Office for Patent No. 1,802,079 he filed there an application for Helle Patent No. 1,813,161, in which patent he expressly says:

"My invention consists in constructing the soldering block from a material such for example as chromium-nickel steel having a sufficient resistance to electric current that it can be used as resistance material for transforming the energy of the electric current into heat."

Plaintiff's expert concludes (as apparently did the Patent Office) that the heating elements of the two Helle patents Nos. 1,802,079 and 1,816,115 are of a high

electrical resistance material having a low temperature coefficient of resistance. There is more basis for this conclusion than for that of the defendants that the soldering element of the two Helle patents is copper. The material forming the heating element of these two patents is not stated or otherwise indicated in the patents. So there can be no basis for defendants' contention except desire.

Cannell No. 445,648 discloses an electrical branding iron. The patentee says: "The branding plate or band 7 is preferably made of iron, nickel or other metal of high resistance."

The court does not believe that any of the patents referred to anticipate or otherwise invalidate the patent in suit.

■ Is the patent in suit a broadened reissue? The court is of the opinion that, viewed from the standpoint of the construction of electrical transformers, there is no difference in meaning of the words "turn," "turns," "winding," and "windings." They may be used interchangeably. Accordingly, the patent in suit is not a broadened reissue.

The Weller reissue patent is not invalid because it contains new matter not present in the original patent. The matter added was merely statements of function and operation and was not therefore violations of the reissue statute.

The defendants contend that error in judgment was the basis for reissue. In this defendants are in error. The basis for the reissue was the recent knowledge of new prior art.

■ The plaintiff has not admitted Claims 1 and 2 of the reissue patent to be invalid, and we have seen that they are not anticipated or otherwise invalidated by the prior art.

The court has not found in the evidence any basis for defendants' contention that the Weller reissue patent is invalid because it was granted on incomplete and erroneous statements made to the Patent Office.

The claims of the reissue patent are, in the court's opinion, sufficiently clear and definite.

The court has, contemporaneously with the filing of this memorandum, made and filed findings of fact and conclusions of law.

The plaintiff shall, within seven days from the date of filing of this memorandum and on notice, present a draft of a decree.