**BRIGHT LEAF INDUSTRIES, Inc.,
Plaintiff,**

v.

**E. Vernon STABLER, J. G. Hendrick, and
W. C. Gates, Individually; E. Vernon
Stabler, J. G. Hendrick, and W. C.
Gates, Co-partners Doing Business Under the Name and Style of Colo-Rite
Manufacturing Company; Colo-Rite
Manufacturing Company, Inc., a Corporation; and, Greenville Butane Gas Co.,
Inc., a Corporation, Separately and Severally, Defendants.**

Civ. A. No. 1249–N.

United States District Court
M. D. Alabama, N. D.
Dec. 17, 1957.

Eaton, Bell, Hunt & Seltzer, Charlotte, N. C., Jennings, Carter & Thompson, Birmingham, Ala., of counsel, for plaintiff.

Bacon & Thomas, Washington, D. C., Edward Taylor Newton and George M. Hopkins, Atlanta, Ga., Poole & Poole, Greenville, Ala., of counsel, for defendants.

JOHNSON, District Judge.

The above-styled cause, coming on to be heard, was tried before the Court without a jury on the issues as made up by the pleadings and the proof.

Upon consideration of the evidence, consisting of the oral testimony of several witnesses, the exhibits, several depositions and the stipulations entered into by and between the parties, the Court now proceeds to make and incorporate in this memorandum opinion the appropriate findings of fact and conclusions of law.

The plaintiff, Bright Leaf Industries, Inc., a corporation of North Carolina, brings this suit for infringement of its United States Patent No. 2,472,534, issued on June 7, 1949, to Gilder S. Horne; said patent was, prior to any of the events concerned in this suit, assigned by the original patentee to this plaintiff. The patent pertains to an improved system and apparatus for curing tobacco in tobacco barns by providing a plurality of properly spaced gas burners within the barn, said burners to be operated from a source of liquefied petroleum gas and with an automatic temperature regulating means. The claims set out in the issued patent are as follows:

"1. A tobacco curing system for curing tobacco hung in a barn comprising a plurality of gas burners disposed within the barn, a source of gas disposed on the exterior of the barn and a piped connection between the source of gas and the burners, said piped connection comprising a main pipe extending along the barn and having branch pipes extending from opposed sides there-

of, each branch pipe being connected to an individual burner, the burners being disposed a substantial distance from the walls of the barn, means associated with each of the burners for regulating the flow of gas thereto, a control valve in the piped connection and temperature controlled means disposed within the barn and connected to said control valve for partially opening or closing the valve to thereby regulate the flow of gas to the burners in accordance with the temperature within the barn.

"2. Apparatus for heating a tobacco barn for curing tobacco disposed therein comprising a plurality of gas burners disposed within the barn a substantial distance away from the walls of the barn, a source of gas on the exterior of the barn, a main pipe leading from the source of gas along a central portion of the barn, individual branch pipes leading from the main pipe to each of the burners, a flow control valve disposed in said pipe and temperature responsive means disposed within the barn and extending to said valve for partially opening or closing the valve to thereby control the flow of gas through the pipe to the burners, and a perforated cage member disposed over each of the burners.

"3. Apparatus for heating a tobacco barn for curing tobacco disposed therein comprising a plurality of gas burners disposed within the barn and spaced a substantial distance away from the walls of the barn, a source of gas on the exterior of the barn, a main pipe leading from the source of gas along a central portion of the barn, individual branch pipes extending from both sides of the main pipe to the burners, a flow control valve disposed in said main pipe and temperature responsive means disposed within the barn and extending to said valve for controlling the size of the opening in the valve to thereby

control the flow of gas through the pipe to the burners, a perforated cage member disposed over each of the burners, a pan disposed within each of said cage members and above said burners for holding water to be evaporated by the heat from the burners.

"4. A tobacco curing system for curing tobacco hung in a barn comprising a plurality of gas burners disposed within the barn and spaced a substantial distance away from the walls of the barn, a source of gas disposed on the exterior of the barn and a piped connection between the source of gas and the burners, means associated with each of the burners for regulating the flow of gas thereto, a control valve in the piped connection and temperature controlled means disposed within the barn and connected to said valve means for controlling the size of the opening in the valve to thereby control the flow of gas to the burners in accordance with the temperature within the barn, and a perforated cage member disposed on the floor of the barn and completely enclosing said burners to shield them against a falling tobacco leaf lodging thereon, said piped connection comprising a main pipe, and each burner having a branch pipe connected to the burner and to the main pipe.

"5. A tobacco curing system for curing tobacco hung in a barn comprising a plurality of gas burners disposed within the barn a substantial distance from the walls of the barn, a source of gas disposed on the exterior of the barn and a piped connection between the source of gas and the burners, said piped connection comprising a main pipe disposed substantially centrally of the barn, and each burner having a branch pipe connected to the burner and to the main pipe, means associated with each of the burners for regulating the flow of gas thereto, a control valve in the piped connection,

temperature controlled means disposed within the barn and connected to said control valve for controlling the size of the opening in the control valve for regulating the flow of gas to the burners in accordance with the temperature within the barn, and a perforated cage member disposed on the floor of the barn and completely enclosing said burners to shield them against a falling tobacco leaf lodging thereon, each of said cage members having a pan in the top portion thereof into which water is adapted to be placed to be evaporated by the heat from the burners."

This Court, upon proper complaint and bond, issued a temporary injunction against the defendants' alleged infringement of said patent. Plaintiff now seeks to have this Court make the injunction permanent, enjoining the defendants from further infringement of said patent; seeks an accounting for profits made by the defendants as a proximate consequence of said infringement; seeks treble damages for defendants' wilful infringement; and also seeks attorneys' fees and court costs for prosecuting this action.

The defendant Greenville Butane Gas Co., Inc., is an Alabama corporation, having a regular and established place of business in this district. The stock in this corporation is owned by the individual defendants, Stabler, Hendrick and Gates, together with Mrs. E. Vernon Stabler, the wife of the defendant Stabler. Mrs. Stabler is inactive in the management of the company. The individual defendants, Stabler, Hendrick and Gates, actively control and manage the Greenville Butane Gas Co., Inc. The defendant Colo-Rite Manufacturing Company, Inc., is an Alabama corporation, having a regular and established place of business in this district. The individual defendants, Stabler, Hendrick and Gates, own all of the issued stock of the Colo-Rite Manufacturing Company, Inc., and the individual defendants actively control and manage the defendant Colo-Rite Manufacturing Company, Inc. The tobacco curing system, as patented, was first used in North and South Carolina in the summer of 1946. It was put on the market and sold in these two states in 1947. Since that date, the plaintiff, Bright Leaf Industries, Inc., acquired the rights to the system as patented and has actively manufactured and sold the patented systems in large numbers throughout the United States and in several foreign countries. From an examination of the claims as set out in the patent, this Court finds that the tobacco curing apparatus that has been and is now being manufactured and sold by the plaintiff is covered by the claims as set out in the patent in suit. It appears from the evidence that this curing system has been favorably accepted and received by the public, and over a period of several years the plaintiff has built up a large and profitable business based upon the commercial success of the patented curing system. As a matter of fact, it appears that the plaintiff is the largest manufacturer of gas-fired tobacco curing systems in the world.

On or about June 2, 1950, the defendant Hendrick, acting for and on behalf of the defendant Greenville Butane Gas Co., Inc., wrote to the plaintiff and requested information about the plaintiff's patented curing system. Plaintiff furnished the requested literature and information, which was marked with patent number 2,472,534. Again, in February of 1951, the defendant Hendrick wrote the plaintiff and, as a result of his inquiry, received further information on the patented system. This information was also marked with the patent number. In March of 1951, the defendant Greenville Butane Gas Co., Inc., ordered a complete system from the plaintiff. This system was shipped with operating instructions also bearing the patent number. Later in 1951, the defendant Greenville Butane Gas Co., Inc., ordered an additional unit from the plaintiff. In the fall or early spring of 1953, the defendants Stabler, Hendrick and Gates, acting individually and as

officials and stockholders in the defendant Butane Gas Co., Inc., commenced to manufacture their own curer for tobacco. Early in 1954, these defendants commenced to manufacture and began selling such curers under the name "Colo-Rite." This manufacturing and selling of these tobacco curers was initially carried on by the individual defendants, Stabler, Hendrick and Gates, and by them through the Greenville Butane Gas Co., Inc. In August of 1954, the plaintiff by letter advised the defendants that the "Colo-Rite" curing system was "probably" an infringement of plaintiff's patent rights. In February of 1955, the individual defendants, Stabler, Hendrick and Gates, formed the defendant corporation Colo-Rite Manufacturing Company, Inc. This new corporation was formed for the sole purpose of manufacturing and selling the tobacco curing apparatus they claim was designed by them. The sum of $1,500 was paid into this new corporation and it was paid in from the assets of the defendant Butane Gas Co., Inc. All funds for the operation of the Colo-Rite Manufacturing Company, Inc., came from the defendant Butane Gas Co., Inc., or from loans obtained by the last named corporation upon the signature or endorsement of the defendant Stabler. The defendant Colo-Rite Manufacturing Company, Inc., being operated by these individual defendants, continued to manufacture and sell the curers that plaintiff alleged infringed their patent curers until this Court issued its preliminary injunction. Practically at all, if not at all, times since its formation the defendant Colo-Rite Manufacturing Company, Inc., and the defendant Greenville Butane Gas Co., Inc., have occupied the same office space and used the same employees.

As stated above, the invention of the patent in suit pertains to a gas-fired tobacco curing system based upon a new concept of curing wherein low, even, carefully controlled heat and high air volume are utilized to obtain new and improved results unobtainable in prior systems using high heat and relatively low air movement.

The elements set forth in the five patent claims work together in combination to produce new and unobvious results heretofore unobtainable. At the time of the invention, tobacco curing was a well-known and highly developed art, and many types of curers, both patented and unpatented, had been used with varying results. These curers can be classified into three broad types. First, the flue type of curer utilizing flue pipes extending into a barn and into which hot air is introduced to create radiant heat within the barn. The hot air was first produced by a wood fire in a furnace connected to the flue and later by oil burners and coal stokers. Very little air was moved within the barn and the tobacco was cured primarily by heat radiated from the flue pipes.

A second type of curer utilized a plurality of independent gravity fed, wick-type oil burners, each having a vent stack extending through the roof of the barn for venting away a portion of the fumes and products of oil combustion. A third type of curer utilized a plurality of stove units, usually four, spaced one adjacent to each corner of the barn. Each stove usually contained four or more individual oil burners which created concentrated heat at each stove. In some instances, excess air was introduced adjacent to each stove.

These prior curers had many disadvantages, such as the use of excess heat in curing, the introduction of products of combustion and partial combustion into the barn resulting in contamination of the tobacco being cured. It was also exceedingly difficult if not impossible to adequately control the temperature of prior units. Many of these units utilizing open oil flames constituted a fire hazard which was due, in part, to the inability to adequately control temperatures. The low air movement of most of these units resulted in excessive curing times. The initial cost and short life of most of these prior curers as well as the

labor cost involved in the installation and operation of the units resulted in excessive costs of curing. Frequently, poor results were obtained due to uneven curing in certain areas of the barn, excessive heat, contamination by soot, oil fumes and the like.

The use of liquid fuel in these prior curers made it very difficult to control temperature, as it was necessary to maintain each burner absolutely level, and attempts to use thermostatic devices were not successful due to the backup of liquid fuel in the line and the requirement of electric service for adequate thermostatic control. The upkeep and replacement of these units constituted an increase in cost as oil burners after slight wear tended to burn irregularly and introduce soot and smoke into the barn. The danger of keeping liquid fuel both inside and outside the barn created a constant fire hazard. In using high temperature, much waste heat was vented out of the barn, resulting in increased fuel costs, and the inability to properly adjust the various burners resulted in uneven heat and tobacco which was improperly and unevenly cured.

The industry, for years, has worked to try to overcome these disadvantages, and in some prior curers one or more of the disadvantages were partially overcome, but insofar as the Court is aware no curer prior to plaintiff's invention successfully overcame all of these disadvantages. The art is replete with numerous patents and attempts by others to construct a curing system which would solve these problems. Almost if not all of the individual elements of plaintiff's system were known individually for years and gas fuel was available in this area for some years prior to plaintiff's invention, yet no one prior to plaintiff had the inventive concept of combining these elements with this particular type of fuel to provide a new system wherein low heat and high air movement are utilized to obtain even curing, resulting in heavier and better grade tobacco.

The gas curing system the defendants claim to have perfected, which they man-ufactured and sold, is practically identical with the patented system of the plaintiff. It has a plurality of gas burners, to be disposed and spaced in the tobacco barn by branch pipes, same means for regulating gas, controlling the flame, same type of control valves, same type of burners, heat spreaders, perforated cage members, and the general layout is practically identical to the system patented by the plaintiff's assignor.

Prior to the institution of this suit and on September 10, 1956, the plaintiff gave formal notice to the defendants that it considered the product being manufactured and sold by these defendants to be an infringement of United States Patent No. 2,472,534. The defendants were by said notice called upon to immediately cease from further infringement of said patent. The defendants until enjoined refused to cease the manufacturing and selling of their tobacco curing apparatus.

To the plaintiff's claim, the defendants deny infringement and say that the plaintiff's patent is invalid upon the grounds that the subject matter and all material and substantial parts of plaintiff's apparatus had been previously patented. The defendants also say affirmatively that the application for plaintiff's patent failed to describe and claim as required by Title 35, § 112 of the United States Code; that the patent applicant knowingly described and claimed more than he had invented; that the subject matter of said patent was in public use for over one year prior to the original application; that the patent applicant concealed material facts and made material misrepresentations to examiners, thereby making said patent rights unenforceable, and also that the plaintiff has been and is now misusing the patent in illegally attempting to extend the rights conferred by said patent. The defendants also deny plaintiff is entitled to any damages even if the patent is valid and even if they have infringed it, said denial being predicated upon the alleged failure of the plaintiff to give notice to defendants as required by Title 35, § 287 of the United States Code.

More specifically, the defendants say the curer they manufacture does not infringe the plaintiff's patent rights even if plaintiff's patent is held to be valid, because the defendants' curer has a main pipe "at one end" of the barn but not along "the central portion" of the barn; that the defendants' apparatus has the burners in "series" instead of "parallel"; that the defendants' structure has a valve which is, as is plaintiff's structure, controlled by thermostat but that this valve completely closes, whereas the plaintiff's valve only partially closes; that the pan or heat spreader of defendants' device is on the outside of the perforated cage member and not "within" the cage member; further, that the perforated cage member of the defendants' structure is not "on the floor" but is suspended from a metal frame which rests on the floor. The defendants also claim that the plaintiff's patent is not valid because of the oral testimony of certain witnesses, taken by deposition, which testimony the defendants say reflects that the device plaintiff claims to have patented was in public use in this country for more than one year prior to the filing of the application for the patent, said application having been filed on August 12, 1946. From a close study of all this testimony, this Court is of the opinion that the testimony is insufficient to sustain this position of the defendants. The testimony is vague, unsubstantiated by any documentary evidence, and, at best, tends to show that there was certain experimentation going on by certain individuals in an effort to perfect the gas-fired tobacco curer, such as the plaintiff's assignor patented. Further, the defendants state that plaintiff's patent is invalid within the meaning of Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corporation, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162, since the claims of plaintiff's patent define a combination of old elements each performing their old function and therefore define nothing new or novel, and, further, that said system achieves no new and unexpected results. In support of this contention, the defendants rely upon a large number of patents, as follows:

| U. S. Patent No. | Patentee | Date |
| --- | --- | --- |
| 1,040,986 | W. B. Bastian | October 8, 1912 |
| 1,176,957 | J. C. Gillette | March 28, 1916 |
| 1,368,018 | J. O. Brock | February 8, 1921 |
| 1,488,324 | J. H. Drake | March 25, 1924 |
| 1,589,386 | P. S. Harper | June 22, 1926 |
| 1,667,512 | G. O. Cruikshank | April 24, 1928 |
| 1,811,980 | F. H. Smith | June 20, 1931 |
| 1,871,783 | A. Friedman | August 16, 1932 |
| 1,888,449 | G. E. Burns | November 22, 1932 |
| 2,123,204 | M. J. Roberts | July 12, 1938 |
| 2,051,348 | F. H. Smith | August 18, 1936 |
| 2,124,074 | R. E. Mayo | July 19, 1938 |
| 2,127,445 | R. M. Hardgrove | August 16, 1938 |
| 2,134,843 | W. C. Rouse | November 1, 1938 |
| 2,139,344 | C. S. Andersen | December 6, 1938 |
| 2,164,511 | F. A. Furlong | July 4, 1939 |
| 2,170,735 | R. L. Spikes | August 22, 1939 |
| 2,180,789 | J. E. Browning | November 21, 1939 |
| 2,216,075 | J. R. Henderson | September 24, 1940 |
| 2,197,325 | R. L. Spikes | April 16, 1940 |
| 2,223,696 | R. E. Mayo | December 3, 1940 |
| 2,273,284 | G. G. Plott et al. | February 17, 1942 |
| 2,300,560 | H. A. Faber | November 3, 1942 |
| Re. 22,221 | R. E. Mayo | November 10, 1942 |
| 2,331,476 | E. A. Jones | October 12, 1943 |
| 2,470,996 | W. L. McGrath | May 24, 1949 |
| 2,573,502 | W. Smith, Jr. | October 30, 1951 |
| 1,509,902 | Reynolds | September 30, 1924 |
| 1,493,889 | Mims | May 13, 1924 |
| 265,051 | Fizer | September 26, 1882 |

This Court specifically finds that none of the prior art advanced by these defendants anticipates any of the claims of the patent in suit, nor renders said claims devoid of their inventive character. As a matter of fact, the patents to Burns (1,888,449), Hardgrove (2,127,445), Andersen (2,139,344), Furlong (2,164,511), Faber (2,300,560), Jones (2,331,476) and McGrath (2,470,996) pertain to control systems for heating devices such as furnaces, hot water heaters and the like, and do not in any way anticipate the claims of the patent in suit for a gas-fired tobacco curing system.

The patents to Bastian (1,040,986), Harper (1,589,386), Friedman (1,871,783), Roberts (2,123,204), Browning (2,180,789), and Smith (2,573,502) pertain to gas burner construction, a feature of the patent in suit which is not claimed to be novel *per se* by plaintiff and these patents do not anticipate any of the claims of the patent in suit.

The patents to Gillette (1,176,957), Cruikshank (1,667,512), Smith (2,051,-

348) and Smith (1,811,980), Spikes (2,-170,735) and Plott et al. (2,273,284) were considered and made of record by the United States Patent Office during the prosecution of the Horne patent in suit and the patent was issued over the disclosures of these patents. These patents do not anticipate any of the claims of the patent in suit.

The patent to Henderson (2,216,075) discloses a combination flue and open-type oil burner system similar to that disclosed in the two Smith patents placed of record by the United States Patent Office during the prosecution of the Horne patent in suit, and does not anticipate the claims of the patent in suit.

The patents to Mims (1,493,889) and Drake (1,488,324) pertain to drying houses similar to that shown in the Gillette patent placed of record by the United States Patent Office during the prosecution of the Horne patent in suit, and these patents do not anticipate the claims of the patent in suit.

The patents to Mayo (2,124,074, 2,223,-696, and reissue 22,221) and Spikes (2,-197,325) all disclose oil-fired tobacco curers of the stove-type similar to that shown in the Spikes patent cited by the United States Patent Office in the Horne file. These patents do not anticipate any of the claims of the patent in suit.

The patents to Rouse (2,134,843) and Fizer (265,051) are similar to the vent-type burners shown in Plott et al. (2,273,-284), which was cited in the Horne patent file, and these patents do not anticipate the claims of the Horne invention.

The patent to Reynolds (1,509,902) shows a large stove-type heater utilizing fuel oil and does not anticipate the claims of the patent in suit.

The Brock patent (1,368,018) shows a plurality of elongated pipe burners into which liquid fuel jets are directed. The Brock structure appears to be inoperable and unsafe, and the patent to Brock does not anticipate the claims of the patent in suit.

This Court specifically finds that the patent in suit was the first of its kind to combine in a tobacco curing system a plurality of gas burners disposed within a tobacco curing barn, a source of liquid petroleum gas disposed on the exterior of the barn, and a pipe connecting the burners and the source with a practical and workable temperature regulator for regulating the flow of gas to the burners as desired by the operator. This Court further finds that the combination of elements claimed in the patent in suit worked together to produce a better and more advantageous curing system than previously available. The patented system permits curing in a clean, odorless atmosphere with even and uniform heat. It provides for greater volume and more uniform movement of air during the curing process and eliminates the undesirable air channel through the tobacco being cured. The patented system eliminates the need for placing fuel into the barn, eliminates the need for leveling, adjusting, and cleaning the gravity fed air-wick burners previously known to the art. The patented system provides, for the first time known to the art, an accurate, simply operated means for controlling the temperature throughout the entire tobacco curing barn and throughout all of the curing stages.

This Court concludes that since this litigation arises under the patent laws of the United States, the Court has jurisdiction of the subject matter and of the parties to this litigation. This Court further concludes that the patent number 2,472,534, as issued by the United States Patent Office on June 7, 1949, after an examination by a patent office examiner, is valid. The leading case of Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 676, 81 L.Ed. 983, sets out the burden upon these defendants that allege invalidity of such a patent, in stating:

"The issue of the patent is enough to show, until the contrary appears, that all the conditions under which a discovery is patentable in accordance with the statutes have been met. Hence, the burden of proving want of novelty is upon him who

avers it. Walker on Patents, § 116. Not only is the burden to make good this defense, upon the party setting it up, but his burden is a heavy one, as it has been held that 'every reasonable doubt should be resolved against him.' "

The Court of Appeals for this Circuit recognizes and adheres to this basic principle of patent law. See Robertson Rock Bit Co. v. Hughes Tool Co., 5 Cir., 1949, 176 F.2d 783; Newport Industries, Inc. v. Crosby Naval Stores, 5 Cir., 1944, 139 F.2d 611; Cameron Iron Works, Inc. v. Stekoll, 5 Cir., 1957, 242 F.2d 17, and Jeoffroy Mfg., Inc. v. Graham, 5 Cir., 1955, 219 F.2d 511.

This Court further concludes that the patent in suit meets the standards of invention as set up for determining validity in § 103 of the Patent Act of 1952, and that the Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corporation case cannot be used by these defendants as a "sanctuary." This Court is of the opinion that Judge Learned Hand in the case of Lyon v. Bausch & Lomb Optical Co., 2 Cir., 1955, 224 F.2d 530, certiorari denied 350 U.S. 911, 76 S.Ct. 193, 100 L.Ed. 799, correctly analyzes the applicable statute and the preceding case law and, as this Court now does, declined to find that the Great Atlantic & Pacific Tea Co. case theory was applicable to facts such as exist in this case. The Bausch case has been followed in the Fourth Circuit by the case of Brown v. Brock, 1957, 240 F.2d 723, and in the Third Circuit in the case of R. M. Palmer Co. v. Luden's Inc., 1956, 236 F.2d 496.

Applying the test as set up by these cases to the present patented structure, it appears that despite the long existence of the individual elements of the combination and the known characteristics of gas as a fuel, no one, even though all recognized the existence of the problems in tobacco curing, produced such an invention as that here patented. As a matter of fact, the defendants' Chinese copy of plaintiff's patented device is further evidence of the validity of plaintiff's patent. See Fluid Systems v. Great Lakes Equipment Company, D.C.N.D. Ohio, 128 F.Supp. 574, 575, affirmed 6 Cir., 1954, 217 F.2d 613, wherein the district court stated:

"The growth of the plaintiff's business following the interruption of the war has been impressive, and if there were doubt as to the inventive quality of the patent claims in suit, such public acceptance and commercial success would go far to resolve it; and the tribute paid by the defendant in adopting, in modified form, the system of the plaintiff, in great part gives considerable support to validity."

Also see Denis v. Ellis, Inc., D.C.Mass., 125 F.Supp. 583, 586, and Weller Mfg. Co. v. Wen Products, Inc., D.C.Ill.1954, 101 U.S.P.Q. 14, 27, 121 F.Supp. 198, affirmed, 7 Cir., 1956, 231 F.2d 795.

■ This Court concludes, further, that defendants' "file wrapper estoppel" defense is without merit, since whatever cancellation in rewriting that was made in this instance at the request of the patent examiner was made to secure a more definite language and the defendants have failed to show that their infringement is within the area to which the "prior art could possibly have been thought to extend so as to make it impossible to make valid claims there, for there is no reason to presume that applicant made a disclaimer broader than necessary to yield to the actual challenge to his claim." See Hunt Tool Co. v. Lawrence, 5 Cir., 242 F.2d 347, certiorari denied 354 U.S. 910, 77 S.Ct. 1296, 1 L.Ed.2d 1428.

This Court further concludes that the defendants, separately and severally, violated the provisions of Title 35 U.S.C.A. § 271(a) in that they without authority made, used and sold patented invention 2,472,534 within the continental limits of the United States, while said patented invention was protected under the patent laws of the United States. This Court concludes that the evidence is clear and convincing that said infringement on the part of all the defendants was wilful and

deliberate, with a full and complete knowledge of plaintiff's system and also with the knowledge that plaintiff's structure was patented and protected; further, that the infringement continued after written notice from the plaintiff, and, as a matter of fact, the defendants formed a separate sham corporation for the sole purpose of carrying on the infringement activities. It appears from the evidence in this case that the only real effort made by the defendants to deny infringement is based upon a strict and unrealistic interpretation of the words of the patent claim, and in view of this interpretation the defendants would have this Court to say the elements they have "added" to those claimed cause infringement not to exist. Such a contention was dealt with in the case of Matthews v. Koolvent Metal Awning Co., 1946, 158 F.2d 37, 38, where the Fifth Circuit Court of Appeals stated:

"Appealing from a decree adjudging the patent valid but not infringed, plaintiffs are here querying, 'What shall it profit a patentee that his patent is declared valid if his claims are so precisely read, the range of equivalence so narrowly confined, that piracy is rewarded for the cunningness of its dissimulation and the patentee is robbed of the fruits of his invention?'

\* \* \* \* \* \*

"We are not concerned here with determining whether defendant's device, which plaintiffs charge is an infringement of the Matthews' patent, is exactly the same in appearance or in form, but merely whether it is substantially the same in function. In short, the decisive question here is, reading the claims of plaintiffs' patent on the Koolvent awning and interpreting them fairly in accordance with their plain intent and coverage, does defendant's device infringe? We think it does. The doctrine of equivalency has never been a mere dry bones doctrine. Put forward to do justice and prevent defrauding by dissimulation and de-

ceit, it should be, it has been, applied to give its equitable purpose effect. Not at all recondite or difficult of understanding or application, it is the mere expression and application of the view that like things are alike and that they are not made unlike by formal and nonsubstantial changes, no matter how cunningly contrived the dissimulation, how clever the changes in form. We think it clear that defendant's device is substantially identical in function with, and is an infringement of, claims three, four, five, nine and ten of the Matthews' patent."

For all purposes, the defendants' structure is identical in function and substantially identical in form to plaintiff's patented structure. Infringement is obvious. This determination of infringement and this determination of validity of patent number 2,472,534 is effective against and binding upon all of the defendants in this case.

■ This Court further concludes that there is no evidence to support defendants' claim that the patent applicant knowingly described and claimed more than he had invented, or that the patent applicant concealed material facts and made material misrepresentations to the examiners, or that the plaintiff has been and is misusing the patent in illegally attempting to extend the rights conferred by the patent. The latter claim of misuse is predicated upon defendants' argument that the plaintiff's sale of assembled or partially assembled curing systems is such a misuse of the patent as will make the patent rights unenforceable. Such a contention is disposed of by the case of Electric Pipe Line, Inc. v. Fluid Systems, 2 Cir., 231 F.2d 370, 371, where Judge Medina stated:

"We turn to the anti-trust feature of the case. Plaintiff's claim is that defendant misused the Lines combination patent by 'attempting to bring unpatented components within the protection of said Letters Patent and to control competition in the unpatented components contrary to

public policy and in violation of the anti-trust laws.' These components include electrical transformers, thermostats, tank heaters, fuel oil heaters, panel boxes, insulated couplings and insulated flanges. While these component parts are unpatented and in a sense old and well-known, those sold by defendant are especially modified or designed for use with the 'Lines Thermal Electric System.' Judge Anderson found that defendant had no intention of preventing the sale of these items for use outside of its patented oil transportation system. We see no reason to disturb this finding."

In this connection, see also Great Lakes Equipment Company v. Fluid Systems, Inc., 6 Cir., 217 F.2d 613.

The judgment, in accordance with the foregoing, will be entered and the temporary injunction heretofore issued by this Court will be made permanent.

Further proceedings, including an accounting to determine what award will be made to the plaintiff as damages within the meaning of §§ 284–288, Title 35 U.S.C.A., will be conducted.